UNITED STATES of America, By William B. SAXBE, the Attorney General, on Behalf of Peter J. Brennan the Secretary of Labor, and the Equal Employment Opportunity Commission, Plaintiff,

v.

ALLEGHENY–LUDLUM INDUSTRIES, INC., et al., Defendants.

Civ. A. No. 74–P–339–S.

United States District Court, N. D. Alabama, S. D.

June 7, 1974.

Robert T. Moore, Dept. of Justice, William L. Robinson, Equal Employment Opportunity Commission, William J. Kilberg, Sol. of Labor, Dept. of Labor, Washington, D. C., for plaintiff.

Ralph L. McAfee, Cravath, Swain & Moore, New York City, William K. Murray and James R. Forman, Jr., Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, Ala., for defendant Companies.

Michael H. Gottesman, Washington, D. C., Jerome A. Cooper, Cooper, Mitch & Crawford, Birmingham, Ala., for defendant Steelworkers.

Judith A. Lonnquist, NOW, Chicago, Ill., Jack Greenberg, New York City, Oscar W. Adams, Jr., Adams, Baker & Clemon, Birmingham, Ala., Gerald A. Smith, Baltimore, Md., Bernard D. Marcus, Kaufman & Harris, Pittsburgh, Pa., Arthur J. Mandell, Mandell & Wright, Houston, Tex., William R. Jones, NAACP, New York City, J. Richmond Pearson, Birmingham, Ala., for petitioners for intervention.

## MEMORANDUM OF OPINION

POINTER, District Judge.

After months of negotiations pursuant to the governmental conciliation function of Title VII, 42 U.S.C.A. § 2000e et seq., the parties herein reached a tentative agreement as to a manner and means for correcting allegedly discriminatory employment practices of a systemic nature at some 240 steel plants and other steel-related facilities throughout the nation. The agreement was reduced to writing in the form of two consent decrees entered into by the United States, through various governmental agencies including the Justice Department, the Labor Department and the Equal Employment Opportunity Commission, as plaintiff, and by nine steel companies and the United Steelworkers of America, as defendants. The proposed decrees were presented to, and entered by, this court on April 12, 1974, resulting in a broad national settlement of Title VII, and related, disputes between the United States and the ten defendants. The provisions reflect a thoughtful and earnest attempt to respond to—and to reconcile competition between—charges of employment discrimination made on behalf of black, female, and Spanish surnamed workers and applicants.

Consent Decree I takes the form of an injunction with respect to those matters which, in general, have previously been affected by collective bargaining between the companies and the union. The decree provides for a restructuring of seniority rules and regulations, primarily using plant continuous service as a base; specifies procedures respecting transfers, promotions, vacancies, layoffs and recalls; and enumerates affirmative action guidelines and goals with respect to trade and craft positions and initial selection and assignment of employees. In recognition that general standards may require tailoring to meet local problems and that experience may indicate the inadequacy of some of the remedial steps, implementation procedures and enforcement tools are established through a structure of Implementation Committees, composed of company, union and minority members, at each affected facility, as well as an Audit and Review Committee which is national in scope. A mechanism for expeditious and co-ordinated resolution of the multitude of pending EEOC charges respecting these defendants is established. A potential back-pay fund of $30,940,000.-00 is created, along with guidelines for calculating and disbursing awards to electing individual employees affected by past discrimination. Jurisdiction is retained by the court for a period of at least five years.

Consent Decree II takes the form of a general injunction respecting those aspects of employment which are, essentially, company-controlled and not normally subject to collective bargaining agreements. The companies are generally enjoined from any form of employment discrimination and are obligated to institute a program of affirmative action with respect to hiring, initial assignments, and management training programs, as well as affirmative recruitment of minorities. See Morrow v. Crisler, 491 F.2d 1053 (CA5 1974); Franks v. Bowman Transportation Co., 495 F.2d 398 (CA5 June 3, 1974). The court retains jurisdiction for at least

five years; and, as also is true regarding Consent Decree I, the consent decree between the government and the defendants does not purport to bind any individual employee or to prevent the institution or maintenance of private litigation.

Shortly after entry of these decrees, various individuals and organizations sought to intervene. A hearing was set for May 20, 1974, with the request that briefs be filed by May 13th and reply briefs by the hearing date. This memorandum is addressed to the claims for intervention and certain other issues raised thereby and is issued after a study of the motions, briefs, reply briefs, and oral argument presented at the May 20th hearing.

## INTERVENTION

■ The court concludes that §§ 707(e) and 706 of Title VII, 42 U.S.C.A. §§ 2000e–6(e) and 2000e–5, confer upon some petitioners a right to intervene within the meaning of Rule 24(a)(1), F.R.Civ.P. This statutory right is provided to a "person or persons aggrieved" within the meaning of Title VII. In this context, the term refers to those individuals with respect to whom alleged discrimination by the defendants is within the scope of a charge which has heretofore been presented to the EEOC, without regard to whether such charge was filed by them, by fellow employees with similar complaints, by an organization on their behalf, or by a member of the EEOC, and without regard to whether or not they are named plaintiffs or actual or putative class members in pending litigation.

1. On May 20, NOW was given leave, essentially *nunc pro tunc*, to amend its pleadings, which were filed only on behalf of the organization, to name not more than three individual women who were to be allowed to intervene pursuant to Rule 24(a)(1) or (b). Such amended pleadings were filed with the court on June 4, 1974.

Most of the individual petitioners—including some who joined in the petitions of the Ad Hoc Committee and of the National Organization of Women[1]—meet the test for intervention of right under Rule 24(a)(1) as just stated. The court concludes that the balance of the individual petitioners—including one who is the principal officer of the Rank and File Committee, the other organizational petitioner—should also be allowed to intervene, given the rather limited purpose for which intervention is being allowed, under the provisions of Rule 24(a)(2) or 24(b)(2).

■ The court denies the requests for intervention by the three organizations, the Ad Hoc Committee, NOW, and the Rank and File Committee. While such organizations may have authority to file charges with the EEOC and even to file lawsuits with respect thereto, they are not "persons aggrieved" for the purpose of any statutory right of intervention under Rule 24(a)(1). In view of the allowed intervention of officers or members of such organizations, it appears that adequate representation is being afforded for any interest the organizations may have. See Rule 24(a)(2) and Hines v. Rapides Parish School Board, 479 F.2d 762 (CA5 1973). Nor, indeed, have the organizations demonstrated a sufficient interest *qua* organizations to justify the additional problems of management and inconvenience caused by unnecessary intervenors. See Bennett v. Madison County Board of Education, 437 F.2d 554 (CA5 1970); Horton v. Lawrence County Board of Education, 425 F.2d 735 (CA5 1970).

■ Such intervention as is allowed is permitted at this time[2] for the limited

2. This is without prejudice to the rights of individuals to seek further intervention, in accordance with the rulings herein, respecting specific questions which have arisen or may arise in the future. *See* Hines v. Rapides Parish School Board, 479 F.2d 762 (CA5 1973). The limitation upon present intervention is placed so that the resolution

purposes of seeking to stay or vacate the consent decrees and to question the contemplated releases of back-pay claims in connection with the payments of back-pay to electing employees under the decree. While the intervenors are to be bound by the decision made with respect to such limited issues, the court does not consider that such intervenors, or any class which they may represent, are at present bound, as a matter of res adjudicata or collateral estoppel, to the terms of the consent decrees themselves.

■ No evidentiary hearings are needed with respect to the issues on which intervention has been allowed. Based upon responses by counsel to questions posed by the court at the May 20th hearing, it is clear that any additional hearings would merely involve an attempt by intervenors to demonstrate in greater detail the alleged deficiencies and problems presented by the decrees, e. g., that the decrees are somewhat open-ended and that there may be already some understandings or proposals as to the manner in which such details will be resolved.[3] There was no indication, however, that any evidence would be tendered respecting the basic allegations against the decrees which are not apparent upon the record. Moreover, time weighs heavy in this dispute, for not only must implementation go forward to meet timetables in the decree, but also delay would adversely affect many of the admittedly prophylactic provisions of the decrees to the detriment of the beneficiaries of Title VII. As the court is convinced that the suggested evidence would not materially contribute to the resolution of the limited issues upon which intervention has been allowed, there is no sound reason to schedule an evidentiary hearing.

## ALLEGED ILLEGALITY OF CONSENT DECREE

■ Intervenors attack the consent decree on various grounds of alleged illegality, including vagueness; venue deprival; lack of advance notice; enforcement by violators; insufficiency of relief; direct interference with rights of individuals to file, maintain or pursue individual remedies; and a renunciation of statutory responsibility by executive agencies.

Without here separately listing the considerations involved in each of these thrusts, the court concludes that, as attacks on the decrees as a whole, they are due to be denied and overruled, and that the intervenors do not demonstrate or suggest anything illegal, improper or fundamentally unsound in these decrees, which, it should be emphasized, are not binding on individual employees.

By undertaking to resolve by settlement the myriad of problems regarding employment discrimination in the steel industry—discussions to which individual employees and their supporting organizations were not privy—the executive agencies have not renounced their statutory responsibilities as alleged. Such efforts are consistent, not inconsistent, with the statutorily mandated duty of conference, conciliation and persuasion embodied in Title VII. It moreover appears that the commitment[4] undertaken by the government with respect to pending or future Title VII litigation

---

of the fundamental questions will not be delayed by disputes over matters which, in essence, are details.

3. See note 2 *supra*.

4. A letter from the original parties herein was received by the court on June 3, 1974. Such has been filed on record as it serves to clarify the obligations of the United States with respect to future action pursuant to the consent decrees. Nor would it be sound to assume that the government can not oppose relief sought by a private litigant: for example, if a particular black plaintiff, due to his own situation, were to seek an occupational seniority rule considered by the EEOC to be generally adverse to the interests of other black employees, it could hardly be asserted that the EEOC is bound to advocate such relief.

involving these defendants does not preclude the government from advocating, and bringing expeditiously into court if a satisfactory resolution is not accomplished through the settlement procedures established, a claim for other relief by an aggrieved employee.

■ The court does recognize that these decrees may, as a practical matter, impede, if not impair, some interests of private litigants. Indeed, it must be assumed that concessions during settlement negotiations were motivated in part by the desire of the parties to avoid, by anticipatory corrections, future litigation and to provide more expeditious solutions even in matters already in the judicial processes. Justice delayed may, it is said, be justice denied. Moreover, it must be kept in mind that resolution in this forum of issues between the government and the defendants does not preclude additional—or even inconsistent—relief in favor of private parties in other litigation. As stressed by Congress in the passage of Title VII and its amendments, settlement offers the principal hope for rapid correction of the ills of employment discrimination, preserving, however—as here—the right to litigate where the persons aggrieved are not parties to the conciliation agreement and believe the settlement to be unsatisfactory.

Some of the wording of the consent decrees may on its face improperly affect the maintenance of private actions. For example, the decrees provide for mailing of back-pay notices even to those involved in pending litigation as named plaintiffs or as determined or putative class members. In view of the court's retained powers and in view of the presence of the parties to this litigation before other forums, such problems, as they are identified, can be satisfactorily resolved, and no doubt there will be a need from time to time for liaison and co-ordination between this court and other forums. The decrees may require clarification in some particulars and, indeed, as administration of the decrees continues, there will doubtless be problems which were not considered or anticipated by the parties or which run counter to their expectations during negotiations. Should such eventualities occur, the court, by virtue of paragraph 20[5] of Consent Decree I and paragraph 2[6] of Consent Decree II, has jurisdiction of this cause for the purpose of issuing subsequent orders, consistent with principles of due process, as necessary to further the purposes and objectives of these decrees.[7]

The court finds nothing illegal respecting the consent decrees themselves, neither in the basic approach to settle-

5. "20. Retained Jurisdiction—The court hereby retains jurisdiction of this cause for the purpose of issuing any additional orders or decrees needed to effectuate, clarify or enforce the full purpose and intent of this Decree.

Anytime after the conclusion of five (5) years from the date of this decree, any party may move to dissolve this decree in whole or in part."

6. "2. The court hereby retains jurisdiction of this cause for the purpose of issuing any additional orders or decrees needed to effectuate, clarify or enforce the full purpose and intent of this decree and/or the agreement attached hereto.

Anytime after the conclusion of five (5) years from the date of this decree, any party may move to dissolve this decree in whole or in part."

7. By letters of June 3, 1974, referred to in note 4 *supra*, the original parties herein have stated that all parties accept the court's view of authority to review any action taken pursuant to the decrees, including actions of the Audit and Review Committee, whether or not any party requests such review. Also, such parties, while perhaps disagreeing with the court as to the limits involved, acknowledge the concept of retained jurisdiction with respect to the effectuation of the full purpose of the decrees. Notwithstanding any such disagreement with the court's view of such powers, the parties advised the court "that none of them wishes to cancel or revoke its consent or withdraw from the Consent Decrees in the above-captioned case."

ment reflected therein, the way in which such were negotiated and entered, nor the manner in which such will be implemented. Parenthetically, the court notes that the suggestion that advance notice was a requirement for the decree— which does not rise to the status of a class action decree—would likely haunt, if adopted by the court, the intervenors and their sponsoring organizations in other litigation. *Cf.* Eisen v. Carlisle & Jacquelin, 42 U.S.L.W. 4804, —— U.S. ——, 94 S.Ct. 2140, 40 L.Ed.2d 732 (May 28, 1974).

### ALLEGED ILLEGALITY OF BACK-PAY RELEASE

In connection with the claim of illegality, some intervenors have raised the question of the binding effect of a release executed by employees who accept back-pay under the decree. The consent decree, however, while providing for the use of such a release, does not contain a judicial finding or conclusion that such could be efficacious. This is an issue in which all parties have an interest and, as a practical matter, is in need of a present resolution. The basic question is whether a signed release in exchange for the payment of back-pay determined under a settlement procedure, as contemplated in paragraph 18(g) of Consent Decree I, can be valid as a matter of public policy.

Intervenors cite, among other similar decisions, Schulte v. Gangi, 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114 (1946), an FLSA case, for the proposition that such a release would be invalid as contravening public policy. Such FLSA cases are, however, distinguishable from the instant case. Relief under the FLSA is defined, 29 U.S.C.A. § 216(c), while Title VII relief is more flexible, 42 U.S. C.A. § 2000e–5(g). While the amount of back-pay for an FLSA violation is, essentially, a matter of simple calculation subject only to the statutory requirements of the Act, Title VII back-pay awards are much more difficult of

ascertainment as such are subject to innumerable variables. *Schulte* seems to be most concerned with the leverage afforded employers *if* employees could be persuaded or coerced into waiving statutory pay minimums.

The legislative history of Title VII, as well as the Act itself in providing substantial mechanisms for conciliation and settlement, 42 U.S.C.A. §§ 2000e–5(b) and (f), indicates a Congressional desire for out-of-court settlement of Title VII violations.

In Alexander v. Gardner-Denver Co., 42 U.S.L.W. 4212, 4219, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) the Supreme Court indicates that there presumably may be an effective release of Title VII claims where the parties enter into a voluntary settlement. For such a waiver to be effective, however, the employee's consent to the settlement must be both "voluntary and knowing". *Id.* at 4219 n. 15, 415 U.S. 52, 94 S.Ct. 1021, 39 L.Ed.2d 147. See also Pettway v. American Cast Iron Pipe Co., 494 F. 2d 211 at notes 152 and 156a (CA5 1974), in which the Fifth Circuit seems to indicate its approval of voluntary settlement of similar issues.

This court concludes that there can be a legal waiver of back-pay claims where, for valuable consideration, a release is signed knowingly and voluntarily, with adequate notice which gives the employee full possession of the facts. Such a ruling, however, is not to be taken as a prospective ruling on the question of the efficacy of any particular release, as such would require an individual determination of the factual setting in which such a release may be executed.

### CONCLUSION

For the reasons indicated, the court has allowed intervention by the individual petitioners for the limited purposes of seeking to stay or vacate the consent decrees and of challenging the legal efficacy of settlement releases of back-pay

claims and has denied the claims of such intervenors with respect thereto. Intervention by other petitioners or for other purposes has, at present, been denied. By separate document, the order of the court with respect to such matters is filed concurrently herewith.