Jimmie L. **RODGERS** and John A. Turner, Plaintiff,

v.

UNITED STATES STEEL CORPO-RATION et al., Defendants.

Civ. A. No. 71-793.

United States District Court, W. D. Pennsylvania.

Dec. 9, 1975.

Bernard D. Marcus, Kaufman & Harris, Pittsburgh, Pa., Jack Greenberg, New York City, for plaintiff.

Leonard L. Scheinholtz, Reed, Smith, Shaw & McClay, Carl B. Frankel, Pittsburgh, Pa., for defendants.

## OPINION

TEITELBAUM, District Judge.

This is an action for employment discrimination brought by two black employees of defendant United States Steel Corporation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1870, 42 U.S.C. § 1981.

The complaint alleges a systemic pattern of racially-based employment discrimination at United States Steel's Homestead, Pennsylvania production facility. Specifically, plaintiffs allege that the defendant corporation has discriminated against black employees at its Homestead Works in, *inter alia*, initial placement and transfers by hiring blacks into certain designated "black jobs" and not permitting their transfer into so-called "white jobs," and that the seniority system embodied in collective bargaining agreements between the corporation and the defendant unions, coupled with the use of discriminatory employment screening devices, including tests, has operated to lock blacks into menial, lower-paying jobs and to exclude them from more desirable, higher-paying jobs.

The ultimate merits of these contentions are not directly pertinent at this stage of the case, presently before the Court on plaintiffs' motion for class determination under Rule 23 of the Federal Rules of Civil Procedure. The motion seeks a preliminary determination that the case may proceed as a Rule 23(b)(2) class action, with plaintiffs representing a class that:

". . . for purposes of monetary liability or compensation of any sort

is defined to include and to be limited to those blacks who have actually worked in . . . [United States Steel's Homestead plant] at any time in the period from August 24, 1971, until May 1, 1973, on jobs in the unit represented by defendant Local 1397 . . . [and] for purposes of injunctive relief . . . is defined to include and to be limited to those blacks who have actually worked in . . . [the Homestead facility] at any time after August 24, 1971, on jobs in the unit represented by Defendant Local 1397." [1]

The parties have extensively briefed the class issue. Their respective arguments have been duly considered by this Court. For reasons stated below, I will grant the instant motion in favor of named plaintiff Rodgers, dismiss named plaintiff Turner as a class representative and certify the class previously delineated.

## BACKGROUND: THE ALABAMA SETTLEMENT

This prolonged and difficult litigation has evolved—and its parameters have been shaped—in the shadow of proceedings in another forum. Those proceedings, commenced during the pendency of the instant action, involve a massive suit brought by the United States in the federal district court for the Northern District of Alabama to remedy alleged discriminatory employment practices at some 240 steel plants and other steel-related facilities throughout the nation. Nine major steel producers and the United Steelworkers of America were named as defendants.[2]

---

1. Stipulation of the parties, filed February 23, 1973.

2. The defendant companies were Allegheny-Ludlum Industries, Inc., Armco Steel Corporation, Bethlehem Steel Corporation, Jones & Laughlin Steel Corporation, National Steel Corporation, Republic Steel Corporation, *United States Steel Corporation*, Wheeling-Pittsburgh Steel Corporation and Youngs-

town Sheet & Tube Company. The complaint charged that the companies had violated Title VII and Executive Order 11246, 3 C.F.R. 169 et seq., "by hiring and assigning employees on impermissible grounds, and by restricting ethnic minorities and females to low-paying and undesirable jobs with scant opportunities for advancement. The complaint also charged the companies and the union with formulating collective bargaining contracts which estab-

On April 12, 1974, following months of intensive negotiations, the Alabama proceedings culminated in a nationwide settlement manifested by two broad and exhaustively detailed Consent Decrees entered into by representatives of the United States Government, the United Steelworkers and the named steel producers before District Judge Sam C. Pointer. Judge Pointer subsequently approved the Decrees, the substance of which he outlined as follows:

"Consent Decree I takes the form of an injunction with respect to those matters which, in general, have previously been affected by collective bargaining between the companies and the union. The decree provides for a restructuring of seniority rules and regulations, primarily using plant continuous service as a base; specifies procedures respecting transfers, promotions, vacancies, layoffs and recalls; and enumerates affirmative action guidelines and goals with respect to trade and craft positions and initial selection and assignment of employees. In recognition that general standards may require tailoring to meet local problems and that experience may indicate the inadequacy of some of the remedial steps, implementation procedures and enforcement tools are established through a structure of Implementation Committees, composed of company, union and minority members, at each affected facility, as well as an Audit and Review Committee which is national in scope. A mechanism for expeditious and co-ordinated resolution of the multitude of pending EEOC charges respecting these defendants is established. A potential back-pay fund of $30,940,000.00 is created, along with guidelines for calculating and disbursing awards to electing individual employees affected by past discrimination. Jurisdiction is retained by the court for a period of at least five years.

"Consent Decree II takes the form of a general injunction respecting those aspects of employment which are, essentially, company-controlled and not normally subject to collective bargaining agreements. The companies are generally enjoined from any form of employment discrimination and are obligated to institute a program of affirmative action with respect to hiring, initial assignments, and management training programs, as well as affirmative recruitment of minorities. . . . The court retains jurisdiction for at least five years; and, as also is true regarding Consent Decree I, the consent decree between the government and the defendants does not purport to bind any individual employee or to prevent the institution or maintenance of private litigation." *United States v. Allegheny-Ludlum Industries, Inc.,* 63 F.R.D. 1, 3–4 (N. D.Ala.1974), *aff'd, United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826 (5th Cir. 1975).[3]

It is apparent from the foregoing summary that government allegations of pervasive racial discrimination in the basic steel industry have prompted a settlement contemplating relief on a scale that can only be described as massive. That settlement is obviously pertinent to the litigation now before this Court: defendants herein are among the parties to the Consent Decrees, the provisions of which explicitly extend to United States Steel's Homestead Works and cover the employment practices plaintiffs charge there. Accordingly, we have paid close attention to the Alabama proceedings. Mindful of their immense

lished seniority systems for promotion, layoff, recall, and transfer so as to deprive minority and female employees of opportunities for advancement comparable to those enjoyed by white males." *United States v. Al-*

*legheny-Ludlum Industries, Inc.,* 517 F.2d 826, 834 (5th Cir. 1975).

3. The Consent Decrees are reprinted at 431 BNA FEP Manual 125–152 (1974).

scope and potential impact, and of Title VII's emphasis on voluntary compliance,[4] I have endeavored to conduct this litigation so as to prevent interference with the ongoing settlement process.

On June 27, 1974, I ruled that these proceedings would be stayed, and further discovery held in abeyance, in order to consider the impact of the Consent Decrees and to permit the settlement process to move forward at the Homestead facility. That stay expired on January 15, 1975, and discovery on the instant question has since been completed. The central issue now before this Court is whether the steel industry Consent Decrees operate to preclude the class action determination plaintiffs seek.

## THE 23(b)(2) DETERMINATION

The *sine qua non* of class certification under Rule 23(b)(2)[5] is a showing by named plaintiffs that the mandatory requirements of Rule 23(a) are satisfied and, in addition, that defendants:

".  .  . [have] acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole  .  .  .."

■ Defendants' primary challenge to certification in this case is based on the proposition that plaintiffs have failed to meet the quoted standard of (b)(2). Essentially, defendants contend that the instant suit cannot be maintained as a (b)(2) class action on grounds that such treatment is explicitly available only in situations where final injunctive relief is shown to be "appropriate," and plaintiffs have made no showing of a need for such relief beyond that

provided by the Consent Decrees. Thus, it is argued that implementation of the terms of the Decrees at the Homestead Works, having supplied the systemic injunctive relief plaintiffs seek, deprives their suit of the characteristics requisite to a (b)(2) class determination.

I do not agree. While defendants' argument would at first blush seem persuasive, more careful analysis impels the conclusion that it is premised on a basic misinterpretation of the language of (b)(2), as well as on an untenable assumption regarding the impact of the Decrees.

First, assuming *arguendo* that the Decrees do indeed provide all the relief to which plaintiffs might be entitled, this suit still would be maintainable as a (b)(2) class action. Contrary to defendants' contention, the language of that subsection speaks not to the ultimate need for actual injunctive relief, but rather to the nature of the alleged conduct by the party opposing the class which, if proved, would make class-wide equitable relief appropriate. *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir. 1975). Here, plaintiffs charge that defendants "have acted or refused to act" on grounds of race; clearly, these grounds are "generally applicable" to the proposed class of black employees, and the representative plaintiffs seek, *inter alia,* "final injunctive relief with respect to the class as a whole." This is sufficient to satisfy the standard of (b)(2), and class treatment under that subsection is not rendered inappropriate either by the fact that remedial action taken by defendants pursuant to the Consent Decrees might be deemed to eliminate the ultimate need

4. See, e. g., *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d, *supra* at 846–848 (citing cases).

5. Throughout this litigation, plaintiffs have requested certification only under 23(b)(2), and the propriety of an alternate class designation is not at issue here. See Local Rule 34(b)(1) and (2)(D). The defendant com-

pany's supplemental argument against 23(b)(3) certification, while most instructive, is therefore not relevant, especially in view of plaintiffs' explicit agreement that (b)(3) treatment of this action is not appropriate. Memorandum in Support of Plaintiffs' Motion for Class Determination, Sept. 21, 1973, at p. 19.

for injunctive relief, or by the fact that plaintiffs seek back pay monetary relief as part of the essentially equitable Title VII remedy. *Id.* at 250–251.[6]

Second, even if this Court were to adopt defendants' proffered interpretation of the language of (b)(2), we would be compelled at this stage to reject the contention that the Consent Decrees necessarily provide all the injunctive relief that might be awarded in this case. Clearly, the Decrees themselves do not purport to moot the injunctive aspect of the instant suit: as Judge Pointer expressly observed in approving the settlement, ". . . the resolution in this forum of issues between the government and the defendants does not preclude additional—or even inconsistent —relief in favor of private parties in other litigation." *United States v. Allegheny-Ludlum Industries, Inc.,* 63 F. R.D., *supra* at 6.

Moreover, defendants' contention is not demonstrated by their detailed analysis of the close relationship between the remedial provisions of the Consent Decrees and the particulars of plaintiffs' prayer for relief. Regardless of the precise contents of that prayer, this Court would award plaintiffs that relief to which they are entitled by reason of their proof. See *Kahan v. Rosenstiel,* 424 F.2d 161, 174 (3d Cir. 1970). I recognize and have noted that the Alabama settlement embraces a sweeping injunction against invidiously discriminatory employment practices at the Homestead Works. But the Decrees do not appear to provide "the most complete relief possible" under Title VII. See *United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d, *supra* at 853–854. See generally *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Thus, the particulars of the injunctive relief appropriate in this case cannot be determined until the nature and extent—and, indeed, the very existence—of defendants' violation of

---

6. Defendants attempt to distinguish *Wetzel* on grounds that in that case the class had already been certified at the time the defendant employer took remedial action, while in the case *sub judice* the class has not yet been certified. I do not find the asserted distinction persuasive. In reaching its decision, the *Wetzel* court clearly relied, at least in part, on *Arkansas Education Ass'n. v. Board of Education,* 446 F.2d 763, 768 (8th Cir. 1971), which squarely held that class certification under (b)(2) in a Title VII action was proper despite the fact that measures taken by the defendant after the complaint had been filed eliminated the necessity for future injunctive relief, leaving only the question of monetary relief for determination by the court. See *Wetzel, supra* at 251. Moreover, the reasoning in *Wetzel,* while presented in a post-certification context, is equally applicable in the circumstances of the instant case:

". . . [a] Title VII suit against . . . [systemic employment discrimination] is necessarily a suit to end discrimination because of a common class characteristic, in this case sex. . . . The class, all sharing a common characteristic subjected to discrimination, is cohesive as to the claims alleged in the complaint. Thus, a Title VII action is particularly fit for (b)(2) treatment, and the drafters of Rule 23 specifically contemplated that suits against discriminatory hiring and promotion policies would be appropriately maintained under (b)(2). . . .

"The basic nature of a Title VII suit is not altered merely because the employer's change of discriminatory policy prior to the motion for summary judgment has obviated the need for injunctive relief. The conduct of the employer is still answerable 'on grounds generally applicable to the class,' and the relief sought is still 'relief with respect to the class as a whole.' The cohesive characteristics of the class are the vital core of a (b)(2) action. Functionally, these characteristics of the class are still intact in the suit. . . . The class is still appropriately maintained under (b)(2).

"*[Defendant's] policies at the time these charges were made were such that final injunctive relief was appropriate. This satisfies the language of the rule. The nature of these policies, and the nature of the class opposing these policies, does not change merely because subsequent action by [defendant] eliminates the need for final injunctive relief.*" *Id.* at 250–251 (citations omitted; emphasis supplied).

Title VII with respect to the class has been established at trial on the merits, and it is clearly conceivable, as another court noted in certifying a (b)(2) class under quite similar circumstances, that this Court might ultimately ". . . issue an injunction differing from the one consented to in Allegheny-Ludlum in the specifics of its scope or implementation." *Dickerson v. United States Steel Corp.*, 64 F.R.D. 351, 360 (E.D. Pa.1974). For this reason, defendants' contention that the Consent Decrees necessarily render injunctive relief inappropriate in this case can amount to no more than an assumption which this Court is not prepared to embrace.

I have stressed my awareness of the extent of the undertaking manifested by the Alabama Decrees. Government, industry and labor have joined in a voluntary effort to remedy discrimination in the basic steel industry. That effort is obviously earnest, and this Court neither seeks nor intends to belittle the Decrees or to hinder in any way their successful implementation. But plaintiffs in this case, and the persons they seek to represent, were not parties to the Alabama settlement and were not permitted to intervene in that proceeding. This suit is plaintiffs' opportunity to be heard, and its characteristics render it maintainable as a (b)(2) class action. The impact of the Consent Decrees does not alter that result.

*23(a)—ADEQUACY OF REPRESENTATION*

The inquiry necessary to a class determination has of course not yet been completed. As previously stated, such a determination requires a further finding that this action meets the four mandatory prerequisites of Rule 23(a).

We need not dwell on 23(a)(1), (2) or (3). Defendants do not dispute—and I find—that (1) the class is so numerous that joinder of all members is impracticable,[7] (2) there are questions of law or fact common to the class,[8] and (3) the claims of the representative parties are typical of the claims of the class.[9] However, the defendant unions contest the adequacy of named plaintiffs' representation in this action, and, accordingly, the requirement of 23(a)(4) that the representative parties will fairly and adequately protect the interests of the class warrants separate consideration.

■ As the court noted in *Wetzel v. Liberty Mutual Insurance Co., supra* at 247, adequate representation under 23(a)(4) "depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class."

■ There is no dispute as to the quality of plaintiffs' counsel in this case.[10] Rather, the defendant unions'

7. Named plaintiffs bring this action as representatives of a class composed of more than 1,200 persons. Clearly, numerosity renders joinder impracticable in this case. It is conceivable, however, that decertification might eventually be appropriate on a 23(a)(1) basis if, under the terms of the Alabama settlement, class members opt to execute releases in consideration of back pay in such numbers as to render joinder of all remaining members practicable.

8. Plaintiffs' complaint alleges that defendants have practiced systemic forms of discrimination, affecting the class as a whole. These allegations raise questions of fact common to all class members, and such questions in turn raise issues of law as to whether the asserted employment practices, if proved, violate rights secured by virtue of Title VII to all blacks employed at the Homestead Works.

9. Plaintiffs' claims are not merely personal, but perforce representative of the broad class claims in this case. See e. g., *Jenkins v. United Gas Corp.*, 400 F.2d 28, 32–33 (5th Cir. 1968); *Oatis v. Crown-Zellerbach Corp.*, 398 F.2d 496, 498–499 (5th Cir. 1968) ("Racial discrimination is by definition class discrimination . . .").

10. Plaintiffs' principal counsel has demonstrated his competency throughout the course of these proceedings. Co-counsel are ex-

attack on the adequacy of class representation focuses on named plaintiffs themselves, and on the second component of 23(a)(4). The cutting edge of that attack is the contention that plaintiff Turner's current employment status undermines his capacity to act as a fair and adequate class representative. I am compelled to agree.

Since April 1974, Turner has held the position of "vicing foreman" at the Homestead plant. He is therefore a supervisor within the meaning of the National Labor Relations Act, and, as such, serves as a representative of the defendant employer for purposes of collective bargaining and the adjustment of grievances. *United Steelworkers of America, Local 1397, AFL–CIO–CLC (United States Steel Corporation)*, Case No. 6–CB–2831 (NLRB Decision JD–395–74). His position is of a temporary nature, but Turner openly aspires to a permanent foreman's job—and the fact remains that now and for the foreseeable future, he is a representative of management interests in matters that are part and parcel of this lawsuit, and thus stands in direct conflict with the interests of the instant class of unit employees. I recognize that, through his counsel, Turner has vigorously pressed this cause. I do not doubt the sincerity of his purpose. But his supervisory position necessarily and naturally weds him to interests manifestly antagonistic to those of the class he seeks to represent. Especially in a (b)(2) context, where adequate representation demands undiluted loyalty to class interests, see *Wetzel, supra* at 256–257, I am unable to

ignore the potential for conflict inherent in Turner's current employment status.

It does not follow, however, that adequate representation is lacking in this case. Plaintiff Rodgers' position is entirely consistent with class interests, and there is every indication that, through counsel, he will faithfully pursue and protect those interests.

In this regard, I am not persuaded by the unions' apparent, though highly equivocal contention that Rodgers is an inadequate class representative because of the asserted possibility that he might waive all his individual claims in return for back pay under the Consent Decrees and thus effectively drop out of this lawsuit, jeopardizing class member interests. But see *Dickerson v. United States Steel Corp., supra* at 360. Even if Rodgers were to execute a release under the Decrees—and there is ample reason to believe he will not—he would not necessarily waive *all* his claims in this action. See *United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d *supra* at 853–854. Moreover, every class action entails the possibility that named plaintiff's individual claims will be satisfied. If the mere existence of this omnipresent possibility is to be deemed a sufficient basis for denying class certification, then 23(a)(4) amounts to a requirement preclusive of all class actions. This result is quite obviously absurd. Rodgers is presently an adequate representative of the plaintiff class, and the provisions of Rule 23(e),[11] coupled with the professional obligations of counsel, suffice to protect class interests in the unlikely event that his individual claims are extinguished.

perienced specialists in federal civil rights litigation. These attorneys will adequately represent the interests of the instant class.

11. "(e) *DISMISSAL OF COMPROMISE.* A class action shall not be dismissed or com-

promised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

The foregoing discussion is dispositive of the operative issues before this Court. For the reasons set forth, I find that the instant suit is maintainable as a 23(b)(2) class action, and that named plaintiff Rodgers may represent the class previously defined in accordance with the stipulation of the parties. Notice to class members, a matter left to the court's discretion in (b)(2) actions, see *Wetzel, supra* at 254–255, will not be directed at this juncture. The parties have requested, and will be afforded, an opportunity to fully brief the specific terms of any such notice at an appropriate time.

An appropriate Order will be entered in accordance with this Opinion.

### ORDER

And now, to-wit, this 9th day of December, 1975, in consideration of the foregoing Opinion in the above-captioned case, it is ordered:

(1) that plaintiffs' motion for class determination be and the same hereby is granted insofar as it relates to named plaintiff Jimmie L. Rodgers;

(2) that plaintiff John A. Turner be and hereby is dismissed as a class representative in this action;

(3) that the plaintiff class be and hereby is defined, for purposes of monetary liability or compensation of any sort, to include and to be limited to those blacks who have actually worked in United States Steel's Homestead Works at any time in the period from August 24, 1971 until May 1, 1973, on jobs in the unit represented by defendant Local 1397, and, for purposes of injunctive relief, to include and to be limited to those blacks who have actually worked in United States Steel's Homestead Works at any time after August 24, 1971, on jobs in the unit represented by defendant Local 1397.