David CARROLL, Samuel J. Stone, Luther Marshall and Eddie M. Hawkles, Individually and On Behalf of All Other Persons Similarly Situated,

v.

UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC, United Steelworkers of America, AFL–CIO–CLC, Local 2609, United Steelworkers of America, AFL–CIO–CLC, Local 2610, United Steelworkers of America, AFL–CIO–CLC, District No. 8 and Bethlehem Steel Corporation.

Civ. A. No. M–75–374.

United States District Court,
D. Maryland.

May 15, 1980.

Kenneth L. Johnson, Baltimore, Md., and Daniel B. Edelman, Washington, D. C., for plaintiffs.

Douglas D. Connah, Jr., Charles M. Kerr, G. Stewart Webb, Jr., Baltimore, Md., for defendant Bethlehem Steel Corporation.

I. Duke Avnet, and John H. Price, Jr., Baltimore, Md., and George H. Cohen, Robert M. Weinberg, and Jeremiah A. Collins, Washington, D. C., for defendant Unions.

OPINION AND ORDER

JAMES R. MILLER, Jr., District Judge.

*I. Introduction*

Plaintiffs, four long-term black employees of the Primary Mills Department at the Sparrows Point Steel Plant of the Bethlehem Steel Corporation, have brought a class action, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Reconstruction Civil Rights Statute, 42 U.S.C. § 1981, against the defendants, Bethlehem Steel Corporation (hereinafter "Bethlehem"), and the United Steelworkers of America and its locals 2609 and 2610 (hereinafter "the Unions"), for engaging in alleged unlawful employment practices. Although a motion for class certification was filed by the plaintiffs, the court has deemed it appropriate to defer consideration of that motion pending decision on the motion of the defendants for summary judgment. The gravamen of plaintiffs' claim is set forth in Section V, paragraphs 6–8, of the Amended Complaint (Paper No. 11). The operative allegations are essentially as follows:

1. Since the operations at the Sparrows Point Plant commenced, and continuing, the defendants have engaged in acts and practices relating to their seniority system that discriminate against the plaintiffs and the plaintiffs' class members (paragraph 6a).

2. The unit and departmental seniority system set up by the defendants is not a *bona fide* seniority system within the meaning of section 703(h) of the Civil Rights Act of 1964 (paragraph 6b).

3. The defendants have discriminatorily given black employees initial job assignments to the least desirable jobs and have discriminatorily given white employees initial job assignments of the most desirable jobs (paragraphs 6c and 6d).

4. Defendants have set up a system of promotion whereby promotions have been and are made on the basis of unit and departmental seniority, so that the employee first assigned to a unit is always ahead of all employees later assigned to a unit (paragraph 6e).

5. Defendants have set up a job transfer system whereby any employee who transfers to another department or unit must forfeit his seniority and start work there as the most junior employee (paragraph 6f).

6. Reductions in the work force have traditionally taken place first in departments or units where blacks have been assigned (paragraph 6f).

7. The modifications of the seniority system ordered by the Secretary of Labor in January, 1973, and by the United States District court for the Northern District of Alabama on April 12, 1974, are racially discriminatory in their purpose and effect (paragraph 7).

8. The defendants' actions, practices, and policies have been for the sole purpose of discriminating against the black employees and perpetuating the effect of past racial discrimination against black employees (paragraph 8).

Bethlehem and the Unions have filed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

*II. Role of Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides:

"[summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

It is well established that the moving party has the burden of proving that the material facts, as presented, are not in dispute, and that there can be no reasonable dispute as to the legal conclusions to be drawn from those facts. *Adickes v. Kress & Company,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.,* 381 F.2d 245, 249 (4th Cir. 1967). Once the moving party meets this initial burden of proof, the opposing party must set forth specific facts showing that there is a genuine issue for trial. F.R.Civ.P. 56(e); *First National Bank v. Cities Service,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Adickes v. Kress & Co.,* 398 U.S. at 160, n. 22, 90 S.Ct. at 1609, n. 22. A bare contention that the issue is subject to dispute will not suffice. *Zoby v. American Fidelity Co.,* 242 F.2d 76, 80 (4th Cir. 1957). "Neither plaintiff's rhetoric nor his imagination can make undisputed facts into disputed ones or raise a genuine issue with respect thereto." *Schoonfield v. Mayor and City Council of Baltimore,* 399 F.Supp. 1068, 1078 (D.Md.1975), *aff'd without opinion,* 544 F.2d 515 (4th Cir. 1975). In order for the opposing party to raise an issue of credibility "he must produce by way of affidavit or otherwise sufficient evidence to show the court that at trial he will be able to produce some fact to shake the credibility of the affiants. Mere hopes are not enough." *Walpert v. Bart,* 280 F.Supp. 1006, 1013 (D.Md.1967), *aff'd per curiam,* 390 F.2d 877 (4th Cir. 1968). Finally, although a party opposing a motion for summary judgment is entitled to all of the favorable inferences to be drawn from the evidence, such inferences must be firmly based on established facts. *Schoonfield, supra.*

The present controversy stems from allegations of unlawful employment practices. The court recognizes that summary judgment is rarely granted in complex cases charging racial discrimination because "[g]iven the potential subtlety of employment discrimination, granting summary judgment against a Title VII plaintiff is far from a 'summary' process." *Lim v. Citizens Savings & Loan Association,* 430 F.Supp. 802, 817 (N.D.Calif.1976). Nonetheless, summary judgment is properly granted, even in complex cases, where the facts established by the movants' evidence are opposed solely by the opponents' conclusory assertions or are clearly uncontroverted, and the facts so established are "not susceptible" of the interpretation which the opponent sought to give them to create through inference a dispute of material fact. *First National Bank v. Cities Service,* 391 U.S. at 289, 88 S.Ct. at 1592; *Lim,* at 816, *citing Thompson v. Sun Oil Co.,* 523 F.2d 647 (8th Cir. 1975) and *Patmon v. Van Dorn Co.,* 498 F.2d 544 (6th Cir. 1974). *See also EEOC v. Chesapeake & O. Ry.,* 577 F.2d 229 (4th Cir. 1978) where summary judgment for defendant was affirmed in reference to a seniority system. Furthermore, it is particularly appropriate to grant summary judgment where recent court decisions have effectively resolved many of the legal issues, and where the evidence presented is unrefuted. *Id.; Sagers v. Yellow Freight Systems, Inc.,* 529 F.2d 721, 725 (5th Cir. 1976). Therefore, in light of the Supreme Court's decision in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 1843 (1977), which has effectively disposed of many of the legal issues in the case at bar, and in light of the thorough documentation presented by the defendants, Bethlehem and the Unions, in support of their motions, the court has determined that summary judgment is a viable procedure in the instant controversy.[1]

1. Although there are outstanding motions filed by plaintiffs in reference to discovery matters, in response to an inquiry by the court the plaintiffs' counsel stated that none of those

*III. Legal Background*

Through the enactment of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, Congress sought to assure equality of employment opportunities and to eradicate certain invidious employment practices. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). *See also Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 28 (1975); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The evils that Title VII is directed against include discrimination with respect to compensation, terms, conditions, or privileges of employment; and practices that limit, segregate, or classify in any way which would deprive or tend to deprive any individual of employment opportunities. 42 U.S.C. § 2000e–2(a). Section 703(h) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h), carves out an exemption from these broad prohibitions. It provides in pertinent part:

> "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin."

The first decision to consider the significance of § 703(h) was *Quarles v. Phillips Morris, Inc.,* 279 F.Supp. 505 (E.D.Va.1968). In that case, the district court, after a comprehensive review of the legislative history of Title VII held that a neutral seniority system violated Title VII if the seniority system perpetuated the effects of pre-Act discrimination by locking minorities into the undesirable jobs or departments to which they had originally been assigned as a result of discrimination. This view that § 703(h) does not immunize seniority systems that perpetuate the effects of prior discrimination enjoyed wholesale adoption in the Courts of Appeals. See e.g. *United States v. Bethlehem Steel Corp.,* 446 F.2d 652 (2nd Cir. 1971); *United States v. Chesapeake & Ohio Ry. Co.,* 471 F.2d 582 (4th Cir. 1972), *cert. denied, Brotherhood of Railroad Trainsmen v. United States,* 411 U.S. 939, 93 S.Ct. 1893, 36 L.Ed.2d 401 (1973); *Local 189, United Papermakers & Paperworkers v. United States,* 416 F.2d 980 (5th Cir. 1969), *cert. denied,* 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); *United States v. Sheet Metal Workers International Ass'n, Local Union 36,* 416 F.2d 123 (8th Cir. 1969).

Nevertheless, through a trilogy of recent decisions, the Supreme Court has squarely and consistently rejected the earlier cases which held that a seniority system violates Title VII and constitutes present discrimination if it perpetuates the effects of pre-Act discrimination. *International Brotherhood of Teamsters v. United States, supra; United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). In *Teamsters,* where the Supreme Court addressed the issue for the first time, the Court held "an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination." *Teamsters,* 431 U.S. at 353–54, 97 S.Ct. at 1864. After evaluating both the literal terms of § 703(h) and the legislative history of Title VII, the Court observed that "Congress did not intend to make it illegal for employees with vested seniority rights to continue to exercise those rights, even at the expense of pre-Act discriminatees. *Teamsters,* 431 U.S. at 354, 97 S.Ct. at 1864. Rather, the unmistakable purpose of § 703(h) was to make it clear that the routine application of a seniority system, which was in fact "bona fide" and which did not create differences in treatment as the result of an intention to discriminate

outstanding motions related to items of discovery which could be relevant to the issue of whether or not the seniority system in controversy is or was *bona fide* within the meaning of § 703(h).

because of race, would not be unlawful under Title VII. *Teamsters,* 431 U.S. at 352–53, 97 S.Ct. at 1863; *Hardison,* 432 U.S. at 82, 97 S.Ct. at 2275.

*IV. Factual Background*

The historical facts concerning the creation of a seniority system at the Sparrows Point Plant are essentially uncontroverted and are recited in detail in Bethlehem's Memorandum (Paper No. 58, pp. 4–32).

Bethlehem acquired the Sparrows Point Plant in 1916. The seniority system under attack had its formal inception on August 12, 1942, when the first collective bargaining agreement between the Unions and Bethlehem was executed. The 1942 Master Agreement was negotiated at the company level between representatives of Bethlehem's Management and the Steelworkers' Organizing Committee (SWOC), and it applied to all Bethlehem plants. Since 1956, the master agreement has been the product of industrywide negotiations between the International Union and a committee of the major companies known as the Coordinating Committee Steel Companies. The local unions and the individual companies applied the master agreement in accordance with the customs and usages of each plant. The rules with regard to seniority were set forth in Article IX of the 1942 Master Agreement and provided as follows:

> *Article IX—Seniority*
>
> Section 1. In the promotion of Employees to nonsupervisory positions and for the purpose of layoffs in connection with the decreasing of the working force and of the recalling to work of men so laid off, the following factors shall be considered, and if factors (b) and (c) are relatively equal, length of continuous service shall govern:
>
> (a) Length of continuous service in the applicable unit determined as provided in Section 2 of this Article;
>
> (b) Ability to perform the work; and
>
> (c) Physical fitness.
>
> If the application of the rules set forth in this Section in respect to laying off men or recalling them to work would lead to hardship in individual cases, the Management and the Grievance Committee may mutually agree that the factor of family status, i.e., number, age and physical condition of dependants, shall be given consideration.
>
> Section 2. The units within which the seniority rules set forth in Section 1 of this Article shall apply for the respective purposes therein set forth shall be determined from time to time as necessity shall arise by agreement between the Management and the Grievance Committee of the Union at the respective Plants and Works.

This agreement established "unit seniority". That is, for purposes of layoff, recall and promotions, seniority was based on the time spent within a seniority unit, rather than on the time elapsed from one's original employment. The master agreement did not provide employees with a right of transfer from one unit or department to another. In order for any employee to transfer from one unit or department to another, the worker had to "quit," break his service, and begin as a new employee at the plant.

Bethlehem submitted the affidavit of Kenneth L. Houck, retired Assistant Vice President for Industrial and Public Relations of Bethlehem Steel Corporation, in connection with this motion. Mr. Houck was the principal draftsman of the 1942 Master Agreement between Bethlehem and the United Steelworkers, including the seniority provisions of that Agreement contained in Article IX. From then through 1962, Mr. Houck participated in negotiating and drafting every master agreement between Bethlehem and the Steelworkers. Mr. Houck testified in his affidavit, that "[a]t no time was race even remotely a consideration in the negotiations leading to adoption of Article IX." Houck Affidavit ¶ 16. He further stated that "[a]t any given time since seniority at Sparrows Point became the subject of collective bargaining, the same seniority principles have been applicable to all production and maintenance employees, regardless of race." *Id.* ¶ 18.

Similarly, the Defendant Unions have submitted the affidavit of Ben Fischer, Assistant to the President of the United Steelworkers of America. Since 1960, Mr. Fischer has been responsible for the development and negotiation of the provisions of the industrywide basic steel agreements dealing with seniority, job progression, transfer rights and related matters. With regard to the unit structure utilized in the steel industry collective bargaining agreements, Mr. Fischer testified in his affidavit that:

> "To my knowledge, *every* basic steel plant adopted unit seniority, or some similar form of seniority. While I am not familiar with the circumstances at every steel plant, I do know that the reason why unit seniority was a universal phenomenon in the basic steel industry had nothing to do with race."

Fischer Affidavit ¶ 9.

In 1962, again as a result of national negotiations on an industrywide basis between the United Steelworkers of America and the Coordinating Committee Steel Companies, the unit seniority system in 1962 was altered somewhat for purposes of layoff and recall. "Pool areas" were created consisting of the lower paid jobs of one or more departments, and when an employee was about to be laid off from his department, he could exercise plantwide seniority and transfer into a "pool" job. Thus, with the establishment of the pool areas, if the employee was qualified to perform the work and if the vacancy had not otherwise been filled, the worker could use his plant seniority to bid on the job vacancy in another department sharing the same pool. Nevertheless, such openings were usually filled by promoting the most senior worker in the job immediately below the vacancy. Therefore, the only jobs available for intrapool transfers were generally at the low paid, entry level. The 1965 Master Agreement provided similar limited plantwide transfer rights by allowing transfers to lower level jobs in any department that had not been filled by an intra-pool transfer. Employees who transferred under either plan, however, lost accrued seniority for purposes of promotion, and they were paid at the rate of their new entry level jobs. In this respect, an employee who chose to exercise either of these transfer rights had to forfeit all of the benefits of seniority that he had accrued in his pre-transfer position, such as pay rate, promotion opportunities, protection against demotion, and job selection. He entered the new unit as a new employee, generally going to the entry level job.

If the initial job assignment of a black employee had been made on a racially discriminatory basis, the transfer rules, and the seniority system of which they were a part, perpetuated the effects of this discrimination in two ways. First, these procedures tended to lock an employee into the unit to which he was originally placed because the economic penalties of forfeiture of seniority rights and pay levels were not outweighed by the advantages of a change to another unit. Second, even if an employee transferred to a "white" unit, he would never be able to reach the level of a contemporary white employee already in that unit.

In order to alleviate this effect, the Office of Federal Contract Compliance Programs initiated an investigation of Bethlehem Steel Corporation. The Secretary of Labor issued an order, which became effective October 14, 1973, whereby the "unit" seniority system was replaced by the "rightful place" theory of seniority. This seniority system was implemented in order to comply with court decisions that a neutral seniority system that perpetuated the effects of pre-Act discriminatory practices was unlawful. Under the rightful place theory, an employee was entitled to rate retention and seniority carryover when transferring to another unit so that he could achieve his "rightful place"; that is, a job in a white department equal to that of his white contemporary who did not suffer from a discriminatory assignment. The order expressly stated, however, that incumbent workers, white or black, could not be bumped out of their then present positions by blacks with greater plant seniority. The rightful place system was only effective, therefore, with regard to new job vacancies.

The final substantive change in the seniority system at the Sparrows Point Plant occurred as a result of the Consent Decree, entered by the United States District Court for the Northern District of Alabama in *United States v. Allegheny-Ludlum Industries, Inc.*, 63 F.R.D. 1 (N.D.Ala.1974), *aff'd*, 517 F.2d 826 (5th Cir. 1975) *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976), settling claims of racial and sexual discrimination brought by the United States against the steel industry. Effective August 4, 1974, "plant continuous service" became the measure for all seniority events, including transfer opportunities with rate retention. The provisions of the Consent Decree regarding seniority are embodied in Article X of the 1977 Master Agreement. Paragraph 4(a)(1) of Consent Decree I provides, in pertinent part as follows:

> *(1) The change to plant service shall be accomplished without that change in and of itself affecting the relative position of any employee within a seniority unit or line of progression.* In other words, there shall be *no leapfrogging over or rolling or bumping between employees* solely as a result of instituting the change to plant service as a continuous service length measure. However, all future promotions, step-ups, demotions, layoffs, recalls and other practices affected by seniority shall be in accordance with plant service provided that, (a) demotions, layoffs, and other reductions in forces shall be made in descending job sequence order starting with the highest affected job and with the employee on such job having the least length of plant service, and (b) *the sequence on a recall shall be made in the reverse order so that the same experienced personnel shall return to jobs in the same positions relative to one another that existed prior to the reductions.* (emphasis supplied).

Thus, paragraph 4(a)(1) assures that force reductions caused by fluctuations in work levels—situations over which, of course, workers have no control—will not cause the permanent displacement of employees from their positions in a unit. To administer that requirement, the Implementation Committee adopted two Memoranda of Agreement.[2] The first memorandum was adopted on August 25, 1974, and contains the following provision to which plaintiffs object:

> An employee shall be deemed to have incumbency rights (1) to the highest job in his home line of progression or unit to which he has been assigned and regularly worked on a permanent vacancy basis and to which he has not voluntarily relinquished his rights and (2) except as otherwise agreed in writing, to all lower jobs in the line of progression.

(Ex. 16 to Plaintiffs' Opposition).

Charles Feist, Bethlehem's Assistant Superintendent of Labor Relations, and a member of the Sparrows Point Implementation Committee, was asked at this deposition what the Committee meant when it defined incumbency to include "all lower jobs in the line of progression." His response was as follows:

> A. Well, that provision was negotiated for the sole purpose of implementing the 4(a) 1 paragraph, which you will find on Page 28, beginning on 27 and going over to 28.
>
> Q. Would you read what you have referenced to, please, into the record?
>
> A. "All future promotions, step-ups, demotions, layoffs, recalls and other practices affected by seniority shall be in accordance with plant service provided that (a) demotion, layoffs and other reductions in forces shall be made in descending job sequence order starting with the highest affected job and with the employee on such job having the least length of plant

2. Consent Decree I established at each plant affected by the Decree an "Implementation Committee," consisting of Union, Company and Government members, and authorized the Committees to, *inter alia*, "take all steps necessary to assure compliance with [the] Decree." Consent Decree I, ¶ 12. One of the specific duties of each Committee was to describe "existing lines of progression, job incumbency systems or other promotional practices" and to develop such practices "where they do not exist." *Id.*, paragraph 4(a)(1).

service and (b) the sequence on a recall shall be made in the reverse order so that the same experienced people shall return to jobs in the same positions relative to one another that existed prior to the reductions."

Now, basically, if you had a situation where you had a force drop from four crews to no crews, and went back to four crews, there would have been no need for Sub-paragraph 2.

However, that isn't the way the steel business works. We have layoffs occur in waves. Recalls occur in waves or steps. And there are intermittent levels of operation, and at that level there is a layoff, a demotional event.

To the committee, it seemed that it was necessary to have language which would provide that . . . regardless of the reason for the event, whether layoff or recall, that the same people would work in the same relationship to one another that previously existed.

The purpose of that second provision was for a force reduction. Because it has no application in any manner except at times of force reduction. And I'll say more specifically at intermediate levels of force reduction, so that people would be in the same relationship with one another.

Without that provision, the necessarily be in the same relationship with one another, if you're operating at a four crew level and drop down to the three crew level and then to zero, and came back to the two crew level.

Q. Why is it necessary, in your opinion, if it's necessary, to have people in the same relation—

* * * * * *

THE WITNESS: The decree provides that. We were attempting to administer the provisions of the decree.

(Deposition of Charles G. Feist, March 17, 1977, pp. 124–126.)

Plaintiffs have submitted no evidence to controvert Mr. Feist's explanation of the basis for the challenged incumbency rule.[3]

The question of the definition of incumbency rights was submitted to the Audit and Review Committee, which concluded that there was merit to the contention that incumbency rights could have been defined more narrowly, and directed the Implementation Committee to make certain revisions in the August 1974 memorandum. The memorandum was revised effective October 23, 1977. One of the revisions was to delete this provision to which plaintiffs object. (See Ex. 3 to Bethlehem's Motion for Summary Judgment, § 3(a)).

3. Plaintiffs also challenge the system of "Permanent Entitlement" established by Bethlehem under the Secretary of Labor's order. Permanent Entitlement was unilaterally adopted by the Company (see Feist Deposition at 65), and the Unions have therefore presented no evidence with respect to this matter. However, the Unions agree with Bethlehem that Permanent Entitlement was not adopted for a discriminatory purpose. Mr. Feist testified:

A. Permanent entitlement was nothing more than a system to identify, at any point in time, to what job an employee was permanently entitled, so we could administer the seniority events pursuant to the requirements of the Secretary's order.

* * * * * *

We were obliged under the Secretary's order.

It [the Secretary's Order] provided for no leapfrogging. It provided that in a force reduction, in the restoration of the force, that each employee would return to jobs relative to one another that existed prior to the force reduction. And we had to find a means for accomplishing that purpose.

It was necessary for us to determine, at any point in time, what an employee's permanent entitlement would be, to which job he would be permanently entitled, to administer that seniority event.

* * * * * *

Q. [by Mr. Johnson]. As I understand it, the Secretary of Labor told you to implement no leapfrogging, or what have you, pursuant to that order of January of 1973, and you set up the permanent entitlement list or schedule—what you want to call it—pursuant to that order; is that correct?

A. It was set up to administer the order. (Feist Deposition at 61-62, 64-65). Again, plaintiffs have neither controverted this testimony, nor have they presented any evidence with respect to Permanent Entitlement.

Another provision of the August, 1974 memorandum objected to by plaintiffs states that "no permanent vacancy on a position shall be deemed to exist unless all incumbency obligations to that position have been satisfied." (Plaintiffs' Memorandum at 19). Again, plaintiffs have submitted no evidence regarding this provision. The uncontroverted testimony of Mr. Feist was that it had been adopted for legitimate reasons to carry out the requirements of paragraph 4(a)(1) of the Consent Decree. (See Feist Deposition at 151–153). This provision also was revised by the Implementation Committee, effective October 23, 1977, so that now, even while incumbents are laid off from a job, if an opening occurs on that job due to normal attrition (i. e., if an employee dies, quits, retires, promotes, transfers, etc.) it will be treated as a permanent vacancy, and the job will be filled by promotion on the basis of plant seniority, rather than by recalling an incumbent. (See Ex. 3 to Bethlehem's Motion § 6).

Plaintiffs also assert that subsequent to the Consent Decree, certain units that allegedly had previously operated under a system by which employees could, in theory, be promoted directly from the bottom job in the unit to the top job, were revised such that step-by-step promotions were required. (See Plaintiffs' Memorandum at 20, n. 14). Plaintiffs state that "the obvious intent of the new promotion requirement was to retard black promotional opportunities," but they have provided no evidence to support that assertion, which certainly does not follow from the facts they allege.

Where unit service is the measure of seniority, the natural result is that the top jobs in a unit tend to be held by the employees with the most experience in the unit, while the lower jobs are held by those with less experience. Thus, the use of unit service tends to result in a step-by-step progression, even where there is no formal line of progression. This further assures that employees will have the experience needed to perform the jobs to which they are promoted. Since the use of plant service does not produce that result unless there is a formal line of progression, it is hardly surprising that Bethlehem would seek to institute lines of progression in certain units following the change from unit to plant service. In any event, the changes plaintiffs object to were *eliminated* in 1978. (See, Deposition of William Nugent, January 22, 1979, at 75–94; Deposition of Donald Kellner, January 12, 1979, at 10–12).

*V. Discussion*

The four named plaintiffs in the present action are David Carroll, Samuel J. Stone, Luther Marshall, and Eddie M. Hawkes. Each of the four named plaintiffs is a black male production and maintenance employee whose employment at the Sparrows Point Plant antedates July 2, 1965, the effective date of Title VII.

Mr. Carroll and Mr. Stone brought EEOC charges (Bethlehem Exhibits 10 and 11, respectively) on January 11, 1974, and Mr. Hawkes on October 27, 1971 (amended and perfected on May 9, 1973) (Bethlehem Exhibit 12). Mr. Marshall has never filed a state or federal administrative charge. (Deposition at 49–50).

Mr. Carroll was employed at Sparrows Point on May 6, 1953 as a laborer in Unit 101–7. After serving in several units, he voluntarily transferred in 1969 or 1970 to Unit 4–3, the Soaking Pit unit of the Primary Mills, where he has worked since that time. (Plaintiffs' Motion Exhibit 10).

Mr. Stone was employed initially June 18, 1953 in the Primary Mills Department, Unit 4–6. In 1964, he transferred to Unit 4–3, the Soaking Pit unit of the Primary Mills. Like Mr. Carroll, Mr. Stone has worked there since that time. (Plaintiffs' Motion Exhibit 9).

Mr. Marshall was hired on August 15, 1952, into Unit 4–5, the 12-inch skelp mill. On November 12, 1969, he was transferred into Unit 4–9, the bar yard of the Primary Mills Department. On August 29, 1973, Mr. Marshall voluntarily transferred into Unit 4–6, the labor unit of the Primary Mills Department (Plaintiffs' Motion Exhibit 7). Thereafter, he declined to exercise his pre-

ferred transfer right as a member of the affected class under the Secretary's Order. (Deposition at 44, 47), and he has never sought a transfer pursuant to Consent Decree I. (Deposition at 54).

Mr. Hawkes was employed initially July 16, 1946, in Unit 4–5, the 12-inch skelp mill of the Primary Mills Department. Effective March 22, 1970, he was transferred into Unit 4–1, the Slabbing and Blooming Mills unit of the Primary Mills Department.

The Complaint, the plaintiffs' EEOC charges, and the deposition of Mr. Marshall make clear that the grievances involved in this case are based upon the operation of the seniority system. Although the affidavits of the plaintiffs and, certain of the putative class members, filed in opposition to the defendants' motions for summary judgment, purport to describe various alleged racially discriminatory actions taken by the defendants against them, these alleged discriminatory acts, even if subsequent to the date prior to which relief is barred by the applicable statute of limitations, are *not* the subject of this suit. They may have marginal relevance only to the extent to which they shed light on the purpose behind the institution and operation of the seniority system at the Sparrows Point Plant.[4]

The court in *Teamsters* was explicit that "§ 703(h) does not immunize all seniority systems. [Section 703(h)] refers only to 'bona fide' systems, and a proviso requires that any differences in treatment not be 'the result of an intention to discriminate because of race . . .'." *Teamsters,* 431 U.S. at 353, 97 S.Ct. at 1863. In order to determine whether a seniority system is in fact "bona fide", one must examine the totality of the circumstances. *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 352 (1977). The factors considered by the Court in *Teamsters* when analyzing the circumstances were (1) whether the seniority system applied equally to all races; (2) whether the placing of the most desirable jobs in a separate unit was rational, in accord with the industry practice, and consistent with National Labor Relations Board precedents; (3) whether the seniority system had its genesis in racial discrimination; and (4) whether it was negotiated and maintained free from any illegal purpose. *Teamsters,* 431 U.S. at 355–56, 97 S.Ct. at 1864–65.

There are two levels at which the *bona fides* of a seniority system in a nationwide industry, such as the steel industry, could theoretically be attacked. The first is that the concept of unit seniority, as adopted in the steel industry, is not one which is *bona fide.* Initially, it is clear that the abstract concept of unit seniority, as opposed to plantwide seniority, does not preclude a seniority system from being a *bona fide* one under § 703(h) even though it might perpetuate the adverse effects of pre-Act discrimination. This basic premise is a clear legacy of the decision in *Teamsters, supra.* To the extent that the plaintiffs' suit here is based upon the pre-*Teamsters* law, it is without merit. But the plaintiffs, in their present first level of attack, contend that the unit seniority system, as adopted by the steel industry, is not *bona fide.* The second level of attack by the plaintiffs is that, at Sparrows Point itself, the locally defined departments and units were "gerrymandered" in irrational, non-functional ways reflecting a purpose to discriminate on a racial basis between whites and blacks in order to create and perpetuate white units and black units.

The two levels of the attack by the plaintiffs will be examined in the light of the factors enunciated by the Supreme Court in *Teamsters* which determine whether a seniority system is *bona fide.*

*A. Genesis of the Seniority System*

■ Since the record demonstrates unequivocally that the basic framework of the

4. To the extent that the plaintiffs' affidavits assert the existence of overt discrimination at the Sparrows Point Plant subsequent to the statute of limitations date, the weight of those assertions is substantially undermined by the conclusion of the Secretary of Labor *In The Matter of the Bethlehem Steel Corp.*, Executive Order 11246, that there was no evidence that any overtly discriminatory practices continue (Plaintiffs' Motion Exhibit 2, pp. 25 26).

seniority system at the Sparrows Point Plant has been developed on an industrywide basis, the examination of the motivation behind the adoption and development of the industrywide seniority system must be on an industrywide basis.

The record is clear that the purpose of the seniority system, negotiated between the International Union and the steel companies, was to establish objective standards, including length of service, by which decisions relating to employee promotion, demotion, layoff and recall would be made. Every major basic steel plant adopted unit seniority, including racially mixed plants, predominantly black plants and likewise plants which were almost totally white, such as the U.S. Steel Plant in Geneva, Utah (Affidavit of Ben Fischer, paragraph 9) (See generally Memorandum of Unions, pp. 9–28a; Memorandum of Bethlehem, pp. 10–27).

As was noted by Judge Pointer in *Swint v. Pullman Standard,* 17 FEP Cas. 730 (N.D. Ala.1978), the seniority system in the steel industry, and at Sparrows Point, had its genesis at a time when there was widespread racial segregation. This fact alone, however, does not lead to the conclusion that the system itself was the product of racial bias. *Swint v. Pullman Standard,* 17 FEP Cas. at 738. "The system rather came about as a result of color-blind objectives of a union which—unlike most structures and institutions of the era—was not an arm of a segregated society." *Id.* This viewpoint is and has been especially prevalent in the United Steelworkers of America. In its original Constitution, as well as all subsequent Constitutions, the union objectives are declared to be "[t]o unite into one industrial union, *regardless of race, creed, color or nationality,* all men and women employed [in the industry.]" (Emphasis added). This same policy of racial neutrality has been embodied in all Master Agreements between Bethlehem and the Unions. Therefore, although the seniority system at issue had its genesis during a period of racial segregation, there is no evidence that it was established as a result of such discrimination, or as a means to further such discrimination.

*B. Equality of the System*

The Sparrows Point Plant Seniority System has been facially neutral from its creation in the 1942 Master Agreement until the present time. It is evident that regardless of what method of service was utilized to determine promotion, demotion, layoff, recall or transfer rights, the system was applied equally to all races. As noted earlier, the seniority system implemented by the Sparrows Point Plant was in use throughout the entire basic steel industry in the United States inasmuch as it was the product of companywide, and later industrywide, collective bargaining negotiations. In *United States v. Bethlehem Steel Corp.,* 312 F.Supp. 977, 983 (W.D.N.Y.1970), *modified,* 446 F.2d 652 (2nd Cir. 1971) (hereinafter *Lackawanna*), where the same seniority system was in controversy, the district court stated that to the extent the system locked employees into a unit or department and discouraged transfers, it did so for both white and black workers. The Department of Labor relied heavily on *Lackawanna* in reaching its decision *In the Matter of the Bethlehem Steel Corporation.* The Secretary of Labor noted that the case was "very much apposite to the circumstances which attend the past and present employment practices of [Bethlehem] at its Sparrows Point facility." (Opinion at p. 4, n. 4.)

The plaintiffs contend that the conclusion of equal application of a seniority system to both races can only be reached where, as in *Teamsters,* most of the persons discouraged by the seniority system from transferring to other jobs were white. This conclusion, however, would distort the facts and analysis in *Teamsters.* "The reference by the Supreme Court to the numerical impact of the rule should be understood as providing additional support, and not as a *sine qua non,* for its decision—particularly since it apparently accepted the lower court's findings that non-whites had suffered the most from the rule." *Swint v. Pullman-Standard,* 17 FEP Cas. at 733–34. In this respect, to the extent that the seniority sys-

tem at Sparrows Point freezes employees into a unit and discourages transfers, it does so in a uniform manner.

*C. Rationality of the Seniority Units*

Another factor to be considered under the *Teamsters* rationale is "whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice.)" *James v. Stockham Valves & Fittings Co.,* 559 F.2d at 352. The first level of examination is industry-wide.

The no-transfer practices which prevailed in the steel industry applied to blacks and whites alike, and were based on *bona fide* business considerations. Employees in a steel plant generally became familiar with the jobs and safety procedures in their home unit, since they had occasion to observe the jobs being performed, and were often called upon to substitute for employees in their unit who were on vacation, out sick, at lunch, or away from their jobs for other reasons. In addition, jobs within a unit were generally related, such that experience on one job served to provide valuable training for other jobs in the unit.[5] Accordingly, management in the steel industry strongly believed that efficiency, production and safety dictated that jobs should be filled from within the unit or promotional sequence where a vacancy existed, rather than permitting employees to transfer throughout the plant. This fact, rather than any racial considerations, led to the prevalence of no-transfer rules in the steel industry—a basic reality which the Union could not expect to change when the Union gained bargaining rights at Sparrows Point in 1941. See Affidavit of Ben Fischer, paragraphs 6 to 9; Affidavit of Edward Plato, paragraphs 8 to 9; Declaration of Lynal Jones, paragraph 7; Affidavit of James H. Jones, paragraph 9.

Consequently, when the first collectively bargained seniority systems were established in the steel industry, they were invariably based on the concept that employees would be promoted from within their respective units, with no right to transfer from one unit to another. While the determination of the form which seniority systems would take from plant to plant was generally left to negotiations between local plant management and the local unions at each facility, so that systems could be established which would best reflect the nature of the operations at each plant, at virtually every plant the considerations discussed above were present. The result was that throughout the industry, seniority systems were established on the basis of a unit structure (Affidavit of James H. Jones, paragraph 9; Affidavit of Ben Fischer, paragraphs 6 to 9).

Since, for the legitimate reasons discussed above, seniority systems in the steel industry were based on the concept of promotions within units and the absence of any right on the part of employees to transfer from one unit to another, it was logical that seniority would be measured by an employee's length of service in his unit, rather than his plant service. Indeed, because transfers were so rare, in the great majority of cases an employee's plant service date was the same as his unit service date, so that in general, employees did not even consider there to be any question as to how seniority should be measured. (Affidavit of Ben Fischer, paragraph 9). For these reasons, plants throughout the steel industry adopted unit service as the measure of seniority for promotions and most other purposes (Affidavit of Ben Fischer, paragraph 9; Affidavit of James H. Jones, paragraph 9).

In sum, the undisputed facts establish that *bona fide* business purposes were the

5. Within most units, the jobs are grouped into "lines of progression" designed so that an employee is first assigned to the bottom job in the LOP, and then, after learning necessary skills, progresses to the next job in the line of sequence when a vacancy occurs, and so on up the ladder. This assures management of a ready supply of employees with the skills and experiences to promote, step by step, to higher rated jobs in their respective units. *See* Affidavit of Edward Plato, paragraph 9, n. 2.

motivating factors resulting in the adoption of unit seniority in the steel industry.

Looking to the second level of examination, additional undisputed facts further demonstrate the *bona fide* nature of the decision to adopt unit seniority at Sparrows Point. That decision was made in 1941 by representatives of the International Union in companywide negotiations with Bethlehem Steel, on the basis of policy decisions which had been reached at the highest levels of the Union.[6] Any contention that the International Union acted with a discriminatory purpose in proposing unit seniority at Sparrows Point is refuted by the records of the negotiating sessions and by the *bona fide* business considerations upon which the seniority system was based.

There are currently sixty (60) seniority departments at Sparrows Point, and within these departments there are one hundred seventy-three (173) seniority units. The plaintiffs have failed to present any *genuine* authority for their assertion that various jobs were grouped in seniority units and departments in an irrational arrangement of work functions. Rule 56(e) of the Federal Rules of Civil Procedure requires that supporting affidavits be made on one's personal knowledge. The affiant must affirmatively show that he is competent to testify to the matters stated therein. It is clear upon a reading of the deposition of Francis H. Brown that he did not have the requisite personal knowledge of the relevant matters contained in his affidavit, which was submitted by the plaintiffs in support of their memorandum in opposition to defendants' motions for summary judgment, to show a genuine issue for trial. The affiant, Brown,[7] had neither personal knowledge of the original classification of the seniority units, nor of the work functions in the various seniority units.[8]

On the other hand, the district court in *Lackawanna*, in referring to the seniority system structure, noted that the departments' functions interrelate only vertically. "They are disparate as working entities and as to processes utilized and products produced." *Lackawanna,* 312 F.Supp. at 982. The Secretary of Labor also agreed that the plant's work force had been rationally divided.

> "It was accepted by the Panel and I agree that the vertical progression embodied in the plant's present seniority structure is intended to satisfy the valid business purposes of promoting safety as well as efficiency. Given the real and varied hazards present in a steel plant, the great speeds and high temperatures at which many operations proceed, proper training is of great importance not only to the efficiency of the plant, but also to the safety of employees. Each unit has its own peculiar safety hazards."

(Opinion p. 35).

The seniority units were consistent with practices which were being followed by other unionized plants throughout the country, and other companies in the same industry. The seniority units were the product of collective bargaining negotiations on a companywide level. The unit seniority system was in use throughout the entire basic steel

6. The seniority proposals advanced by the Union in the 1941 Bethlehem negotiations had been developed by a conference conducted by the International Union and attended by the national, regional and sub-regional representatives of the Union, together with the presidents of all local unions at plants of Bethlehem Steel, Republic Steel, Youngstown Sheet & Tube, and Inland Steel. See Memorandum, Summary of Steel Negotiations, dated November 1, 1941, Exhibit C to the Affidavit of Kenneth L. Houck filed by defendant Bethlehem in support of its Motion for Summary Judgment, at pp. 1-2.

7. Subsequent to the argument in open court on the motion for summary judgment, the plaintiffs submitted the depositions of Primo Padeletti, William F. Nugent, Donald Kellner, Joseph Saunders, and Devon T. Coats. The court has read those depositions and has concluded that they do not establish a dispute of material fact on the issues now before it. While certain of those depositions tend to establish racially discriminatory initial job assignments prior to the time for which a remedy exists under the applicable statutes of limitations, they do not tend to establish that the seniority system at Sparrows Point was not, or is not, *bona fide.*

8. See also Unions' Reply Memorandum, Paper No. 84, pp. 19-38.

industry in the United States, not just the Sparrows Point Plant, until the Secretary of Labor's 1973 order and the subsequent Consent Decree. The court finds that the units and departments created were rational and in accord with the industry practice. *Cf. EEOC v. Chesapeake & O. Ry., supra.*

*D. Purposes of the Seniority System*

Finally, the court must consider whether the system was negotiated, and has been maintained, free from any illegal purpose. *Teamsters,* 431 U.S. at 356, 97 S.Ct. at 1865. "[A] discriminatory purpose must be shown before a seniority system can be exempted from § 703(h)'s protection." *Southbridge Plastics Division v. Local 759,* 565 F.2d 913, 915–16 (5th Cir. 1978).

In *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, at 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) the court held:

> " 'discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. *See United Jewish Organizations v. Carey,* 430 U.S. 144, 179, [97 S.Ct. 996, 1016, 51 L.Ed.2d 229] (concurring opinion). It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." (footnotes omitted).

There has been no probative evidence that the Sparrows Point Plant seniority system has been negotiated or maintained for a racially discriminatory purpose. Rather, the facts, as previously discussed, illustrate that the seniority system as set forth in the Master Agreements, the Secretary of Labor's order, and Consent Decree I was not, and is not, designed to achieve, or motivated by, racial discrimination.[9]

A few words are necessary in connection with the plaintiffs' assertion that the August, 1974 Implementation Memorandum, purporting to carry out the provisions of Consent Decree I, was motivated by racial discrimination.

As previously noted, paragraph 4(a)(1) of Consent Decree I prohibited "leapfrogging", "rolling" or "bumping" of one employee by another solely on account of the change from unit to plant wide seniority. The Consent Decree created incumbency rights to guarantee that the change in the seniority system would not result in an incumbent losing his job simply because of the change.

Plaintiffs' position is that because blacks were more likely than whites to be working on the lower jobs in many units, by creating incumbency rights on "all lower jobs in the line of progression," the memorandum gave whites incumbency rights "to the jobs occupied by both the white employees and the black employees." Plaintiffs' Memorandum at 19. Plaintiffs contend that only a discriminatory purpose could have produced such a rule.

The problem with plaintiffs' theory is that the provision to which they object is a perfectly natural reading—albeit not the

9. Plaintiffs have argued that an EEOC interpretive memorandum on *Teamsters* supplies the support for a conclusion that the unit seniority system at Sparrows Point was the product of a racially discriminatory intent. That interpretive memorandum states as follows:

> "When a unit seniority system is in effect and the employer or union is made aware that it is locking in minorities or females, discriminatory intent will be inferred if the system is maintained or renegotiated when an alternative system is available."

2 E.P.G. paragraph 5029 (July 12, 1977).

The effect of the interpretive memorandum appears to be at odds with the description of "discriminatory purpose" set out in *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256 at 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870, quoted in the text above. While such an inference might in a given case be justified, in the face of overwhelming evidence to the contrary it "simply fail[s] to ripen into proof." *Id.* at n. 25.

The interpretive memorandum of the EEOC is merely an attempt to make an "endrun" around the decision in *Teamsters* and, as such, is not entitled to "deference" by this Court. *Cf. Espinoza v. Farah Manufacturing Co.,* 462 F.2d 1331 (5th Cir. 1972); aff'd 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973). *Turner v. Seaboard Coast Line Railroad Company,* 78 F.R.D. 654 (E.D.N.C.1978).

only possible reading—of the requirements contained in § 4(a)(1) of the Decree. The uncontroverted record evidence establishes that the Implementation Committee in fact adopted the provision not for any discriminatory purpose, but simply because the Committee in good faith interpreted the Decree as requiring that provision. *Cf. Alexander v. Aero Lodge No. 735*, 565 F.2d 1364 (6th Cir. 1977), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978).

Similar conclusions are inevitable in reference to the other provisions of the August, 1974 Memorandum to which the plaintiffs objected. As noted in Part IV of this opinion, those provisions were eliminated in the October, 1977 Memorandum.

The only objections which the plaintiffs have expressed to the existing seniority system at Sparrows Point are ones which relate to the limitation to the concept upon "rightful place", found in the Secretary of Labor's Orders and in the Consent Decree, that incumbent workers, white or black, may not be bumped out of their present positions by blacks with greater plant seniority. Understandable concern was expressed at argument of these motions by Mr. Edelman, on behalf of the plaintiffs, for the older generation of black workers who were discriminatorily denied the more desirable jobs. Nevertheless the plaintiffs really seek, contrary to § 703(h) as interpreted by *Teamsters*, relief under the "freedom now" theory, in which they would use their plant service to require the displacement of white incumbents.[10] While the position of the plaintiffs is understandable, it simply is not the law as it presently exists and cannot, therefore, be the basis for relief in this court.

## VI. *Conclusion*

Considering the totality of the circumstances, the court holds that the seniority system in the case at bar is *bona fide*, and that the differences in terms, conditions or privileges of employment pursuant to such system *are not the result of an intention to discriminate because of race*. The defendants, Bethlehem and the Unions, have established that the seniority system utilized at the Sparrows Point Plant is immunized from a finding of illegality in that it falls within § 703(h) of the Civil Rights Act of 1964. The plaintiffs have failed to set forth specific facts showing that there is a genuine issue for trial. Therefore, in recogni-

10. The seminal legal scholarship regarding Title VII's applicability to seniority systems was a student work, *Note, Title VII, Seniority Discrimination, and the Incumbent Negro*, 80 Harv.L.Rev. 1260 (1967). It identified "three interpretations of Title VII . . . to answer the question whether the title, contrary to the employee expectations existing at the time Title VII became effective, should be read as requiring the elimination of differences in competitive standing between white and Negro workers attributable to past discrimination. The first, or 'status quo,' approach would leave the seniority rights of white workers intact, at least where giving current effect to these rights would not involve the direct application of a racial principle. Under 'status quo,' positions in the hierarchy already achieved would be preserved; relative to their white contemporaries who had been preferred, Negro incumbents could not improve their status. The second theory, the 'rightful place' approach, holds that the continued maintenance of the relative competitive disadvantage imposed on Negroes by the past operation of a discriminatory system violates Title VII, just as the continued use of the discriminatory rules which created the differential would violate it. To eliminate this differential from the future operation of the system, the 'rightful place' approach would allow an incumbent Negro to bid for openings in 'white' jobs comparable to those held by whites of equal tenure, on the basis of his full length of service with the employer. If he met the existing ability requirements for such a job, he would be entitled to fill it, without regard to the seniority expectations of junior white employees. The 'rightful place' approach requires an adjustment in competitive standing with regard to future job movements arising in the ordinary course of an employer's business. The third approach to Title VII, which might be termed the 'freedom now' theory would go further and argue that maintenance of the distribution of jobs established by a discriminatory system after Title VII became law constitutes an unlawful employment practice. If the adjustment of seniority rights contemplated by the 'rightful place' theory indicates that a senior Negro would have priority over a white worker currently holding a particular job if that job were unfilled, then under 'freedom now' the Negro would be immediately entitled to it, even though this would require the displacement of the white incumbent." *Id.* at 1268–69 (footnote omitted).

tion of the recent Supreme Court decisions which are dispositive of the essential legal issues, the court enters summary judgment in favor of defendants, Bethlehem and the Unions on the Title VII action.

The plaintiffs, have also brought suit under 42 U.S.C. § 1981, which provides:

"All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

The question thus arises whether employees who were allegedly discriminatorily assigned to undesirable jobs before 1965, when Title VII became effective, have a cause of action under § 1981 on the ground that the seniority system perpetuates the effects of the alleged pre-1965 hiring discrimination. This precise question was answered in *Johnson v. Ryder Truck Lines, Inc.*, 575 F.2d 471 (4th Cir. 1978), *cert. denied*, 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239 (1979). In *Johnson*, the court held that where a seniority system has been proven "bona fide" under Title VII, § 1981 will not serve to invalidate that bona fide system. Therefore, the court further grants summary judgment in favor of defendants, Bethlehem and the Unions, with respect to the plaintiffs' cause of action arising under 42 U.S.C. § 1981.

For the reasons set out herein, it is ORDERED this 15th day of May, 1980, that the motions for summary judgment filed by the defendants herein are granted and judgment shall be entered for the defendants with costs.