Wesley P. BERNARD, et al.

v.

GULF OIL CORPORATION, et al.

Civ. A. No. B–76–183–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

Sept. 18, 1986.

Stella M. Morrison, Port Arthur, Tex.,
Charles E. Cotton, New Orleans, La., Ju-

dith Reed, Julius LeVonne Chambers, Eric Schnapper, New York City, Ulysses Gene Thibodeaux, Lake Charles, La., for plaintiffs.

Janet L. Lachman, William G. Duck, Houston, Tex., for defendant, Gulf Oil Corp.

Carl A. Parker, Port Arthur, Tex., for defendant, Oil, Chemical and Atomic Workers Intern. Union, Local 4–23.

## MEMORANDUM OPINION

JOE J. FISHER, District Judge.

Plaintiffs are six present and retired black employees at Gulf Oil Corporation's Port Arthur, Texas, refinery. Plaintiffs, who are also present or former members of the Oil, Chemical and Atomic Worker's Union, Local 4–23 ("OCAW"), allege that Gulf and the OCAW have engaged in a broad range of employment discrimination against black employees. Plaintiffs seek declaratory, injunctive, and monetary relief, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and Section 16 of the Enforcement Act of 1870, 42 U.S.C. § 1981.[1]

A trial was held in April 1984 on the class-wide liability of Gulf and the OCAW. The class-wide claims are predicated upon two fundamental theories: that Gulf and the OCAW committed pre- and post-Title VII violations (1) by formulating and maintaining a non-bona fide seniority system and (2) by administering non-job-related promotion tests and attendance policies that adversely affected blacks.

The individual claims of the named Plaintiffs were also before the Court. They consisted primarily of allegations that Gulf intentionally discriminated against Plaintiffs by not promoting them to supervisory positions and by disqualifying them from other positions.

Both the seniority system and the testing requirements changed during the years in issue. Because the facts are complex, they are addressed in chronological order; first, as to the seniority system and second, as to the test-based promotion program. The individual claims are addressed last.

## I. CLASS CLAIMS

### A. *The Seniority System*
#### (1) *Pre-1963 Discrimination*

Prior to 1963, there existed two OCAW locals at Gulf: Local 245, which represented only black employees, and Local 23, which represented only white employees. At the insistence of the international union, these locals merged in 1963, 2 years before the effective date of Title VII.

Prior to 1967, Gulf's workforce was divided into two major divisions: the Craft Division and the Labor Division. The Craft Division had 14 skilled occupational sections. Each section had its own "line of progression" (LOP). For example, at the lowest end of the boilermaker section is the helper; at the highest end, the number one boilermaker. The higher positions were functionally related to the lower ones and presupposed competency and efficiency in the lower jobs. The Labor Division was composed of men who did work requiring less skill. By 1954, most craft sections had laborers assigned to them. The Labor Division also had separate lines of progressions.

Prior to 1956, all the labor jobs were occupied by blacks, and no laborer was permitted to enter into the Craft Division. The Craft Division was staffed entirely by whites. In both divisions, new employees

---

1. The action was initially filed in May 1976. This court dismissed Plaintiffs' Title VII claims on procedural grounds and granted Defendants summary judgment on Plaintiffs' § 1981 claims. The Court of Appeals for the Fifth Circuit reversed the judgment and remanded the case for trial. *Bernard v. Gulf Oil Co.,* 619 F.2d 459 (en banc) (5th Cir.1980), *aff'd,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

This Court, by Order dated April 2, 1984, certified the class of affected employees to include only black persons who were employed at Gulf's Port Arthur refinery on or after December 26, 1966, who were members of the OCAW and who had not executed releases for back pay pursuant to a 1976 Conciliation Agreement between Gulf and the Equal Employment Opportunity Commission (EEOC).

started at the lowest level positions. That occupational segregation was partially the result of a gentlemen's agreement between the black and white locals to not bid on each others' jobs. The OCAW negotiating committees at that time were made up of both black and white members. The agreement was not imposed by Gulf nor was it incorporated into any of the formal labor agreements. The local memberships apparently viewed the agreement as a means by which to protect their respective positions.

In 1956, the lowest level Labor Division job became the entry-level position for employees of every race.[2] At the same time, seniority provisions were established for transfer between the Labor and Craft Divisions. These provisions covered both black and white laborers who sought promotion to the craft jobs. A labor transferee would start at the lowest job in a Craft Division section. (Technically, such a transferee would first bid into the Mechanical Helper Pool before entering a craft). A laborer could not transfer into an upper level craft position. Vacancies in those jobs were first offered to people in a lower level job in the same section. Such vacancies were posted for plant-wide bidding (i.e., outside that section) only when other Craft Divi-

sion workers had more craft seniority than those bidding from the same section.

Between 1956 and 1963, the period during which this system was in use, a laborer who successfully bid into a craft-line entry position was assigned dual seniority: divisional seniority and plant seniority. Regardless of how much plant seniority a transferee may have accumulated previously, he started in the craft (for purposes of craft-line promotions and demotions) with only one days' divisional seniority. One's plant seniority came into play if workforce reductions were required. That is, a transferee could use his plant seniority to return to labor and thereby avoid lay off. When a transferee was required to return to labor, his Labor Division seniority would then determine promotions and demotions in that division. After 1963, the divisional seniority system was eliminated and plant seniority became the basis for all promotions, demotions, and lay offs.

Plaintiffs allege that the 1956–1963 one-day divisional seniority rule was discriminatory. The discriminatory results were specifically felt when workforce reductions occurred between 1959 and 1961, at which time newly arrived craft-line blacks (and whites) were demoted while pre–1956 craft-

---

**2.** Between the years 1956 and 1963, a high school diploma or its equivalent was also required before one could transfer between labor and craft. Plaintiffs argue that the diploma requirement was not job-related and was based solely upon Defendants' unsubstantiated belief that this level of education was essential for employees who might advance into more complex positions. Plaintiffs also argue that incumbent craft-line whites were not required to obtain the diploma and that almost half of the incumbents did not have one.

Plaintiffs' comparison between entering labor employees and incumbent craft-line personnel is inapposite. Laborers seeking entry into the crafts are not similarly situated to incumbent craft-line employees. The diploma requirement was applied equally to those who were similarly situated, namely, blacks and whites seeking to enter the crafts. The diploma requirement was a new feature of Gulf's seniority system but it was not an essential feature. That requirement was eliminated in 1963. Plaintiffs introduced no statistical evidence to suggest that the diploma requirement made a significant difference

in the number of blacks who would have been admitted into a craft position but for that requirement.

Also, employees seeking to transfer between 1956 and 1963 were required to pass a battery of tests. The battery included: (1) The Bennet Mechanical Comprehension Test; (2) The Doppelt Numerical Personnel Tests for Industries; and (3) The Atis Quick Scoring Mental Ability Test. The same tests were also administered to new hirees beginning in 1956 (when the laborer position became the entry-level position for all employees). The testing requirements applied equally to blacks and whites; except that a post–1956 hiree-transferee did not have to take the test again, since one had already taken it to get hired. Plaintiffs argue that as a result of the post–1956 exemption, the only employees required to take the tests to transfer were blacks (since all whites who worked in labor took the test to get hired). Plaintiffs argue that as a result of the post–1956 exemption, the only employees required to take the tests to transfer were blacks (since all whites who worked in labor took the test to get hired). There is no merit to Plaintiffs' assertion. Both blacks and whites had to take the tests. The fact that they took it at different times is irrelevant.

line whites with less plant seniority were not.

Plaintiffs argue that the one-day divisional seniority rule, in conjunction with the pre–1956 assignment of blacks to Labor and whites to Craft, causally operated to stunt blacks' advancement into the entry- and upper-level craft positions. Plaintiffs conclude that Gulf's seniority system was therefore non-bona fide under Title VII and that both pre- and post-Act discriminatees ought to be awarded constructive seniority and back pay.

### Is The Seniority System Bona Fide?

If Gulf and the OCAW can prove that their seniority system is bona fide, then they are immune to charges of pre-Title VII employment discrimination. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 353–55, 97 S.Ct. 1843, 1863–65, 52 L.Ed.2d 396 (1977). The Court has held that to be bona fide, a pre-Title VII seniority system must not have been designed with the intent to discriminate. *Id.* The Court also held that a bona fide departmental seniority system does not violate Title VII merely because it may perpetuate into the post-Act period the effects of pre-Act discrimination. *Id.* at 352–53, 97 S.Ct. at 1863–64. Moreover, a necessary precondition for maintenance of a post-Act claim is the timely filing of a charge with the EEOC. *See United States v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). Thus, if Plaintiffs cannot prove that Gulf operated a non-bona fide seniority system, they must prove that Defendants engaged in acts of discrimination (whether perpetuated effects or entirely independent) occurring on or after December 26, 1966, which is 180 days prior to the date on which Plaintiffs filed their charges of employment discrimination with the EEOC.

■ Applying *Teamsters,* the Fifth Circuit has phrased the bona fide inquiry this way: Has there been purposeful discrimination in connection with the establishment or continuation of a seniority system which will render that system mala fide? *James*

*v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 351 (5th Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). In arriving at an answer to that question, four factors are evaluated in the context of the totality of circumstances:

(1) whether the seniority system operates to discourage all employees equally from transferring between seniority units,

(2) whether the seniority units are in the same or separate bargaining units and, if separate, whether that structure is rational and industry-wide,

(3) whether the seniority system had its genesis in racial discrimination, and

(4) whether the seniority system was negotiated and maintained free from any illegal purpose. *Id.* at 352. As will be seen, under *James* Gulf's seniority system is bona fide and thus does not violate Title VII.

#### (i) *Equal Transference Between Seniority Units*

■ Plaintiffs argue that the one-day seniority rule was designed to negatively affect blacks and render worthless any plant seniority that they may have accumulated. The Court disagrees.

The one-day rule was facially and operationally neutral: it applied equally to whites and blacks. The purpose and effect of the rule was to maintain the most qualified persons in their respective technical Craft Division positions, as well as to protect the integrity of the vertical promotion system and the legitimate expectations of those already in the craft-lines.

Because a transferee did not forfeit his plant or labor seniority upon transferring into the Craft Division, the rule could not possibly discourage a black laborer from transferring. A transferee could still use plant seniority to avoid layoff and labor seniority in the event he was demoted. There is no evidence that a transferee was subjected to a wage cut upon entering the Craft Division. See *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 223–24 (5th Cir.1974) (fact that transferee endured

a wage cut highly detrimental to bona fides of seniority system).

The elimination of the one-day rule predated the enactment of Title VII. By the effective date of that statute, Gulf and the OCAW had opened up the craft lines for bids based on plant-wide seniority. Plant-wide seniority was also used to determine all promotions and demotions within the craft lines. That is precisely what Plaintiffs contend is the fairest system.

#### (ii) *Same or Separate Bargaining Unit*

There is no "same or separate bargaining unit" controversy in this case. Therefore, *James* factor number two is not in issue.

#### (iii) *Genesis of Seniority Unit*

Plaintiffs contend that Gulf's seniority system had its genesis in racial discrimination. Widespread societal discrimination existed in the South in 1943, the year in which Gulf's seniority system was negotiated. The fact that blacks were initially relegated to the laborer jobs while whites entered the craft positions is proof, assert Plaintiffs, that Gulf specifically adapted its seniority system to the prevailing social prejudices of that time. Plaintiffs argue that to the extent that the seniority system was patterned upon the existing threads of social bigotry, that system preserved and perpetuated that discrimination.

Plaintiffs' allegations that Gulf's seniority system had its genesis in racial *segregation* is not the legal equivalent of saying that the seniority system had its genesis in racial *discrimination*. *See Carroll v. United Steelworkers of America*, 498 F.Supp. 976, 986 (D.Md.), *aff'd*, 639 F.2d 778 (4th Cir.1980). The passive co-existence of union and societal segregation is not enough to render a seniority system mala fide. Rather, Plaintiffs must show that the seniority system, as an insular and structurally independent entity, was designed to effectuate an intent to discriminate on the basis of race or to lock in place blacks previously discriminated against. *Teamsters*, 431 U.S. at 353–55, 97 S.Ct. at 1863–65.

The *Carroll* court looked for objective indicia of intent. For example, the court noted that the purpose of the system was to erect objective standards—most notably, seniority—by which decisions relating to employee promotion, demotion, layoff, and recall were made. *Carroll*, 498 F.Supp. at 986. This kind of seniority system was widely adopted nationwide by major companies, without regard to the racial composition of the particular workforce. *Id.* The bargaining policies of the union were not racially premised. *Id.*

The malapportionment of blacks and whites at Gulf resulted from two sources other than the seniority system. First, there was the unions' gentlemen's agreement to not compete. Without question, the self-imposition of such occupational restraints constituted a joint acquiescence in the invidious predilections of a segregationist society. However, that accommodation, reached by the union locals, was independent of any action taken by Gulf or the OCAW International. The discriminatory aspects of that agreement were not incorporated into any of the formal labor agreements between the Company and the Union. That agreement had no bearing whatsoever on the conceptual integrity of the system. That is, the system was not structured to discriminate; nor were the discriminatory consequences connected in any way with the system *per se*. Those consequences were in part superimposed by the workers themselves upon an otherwise neutral seniority system.

The second factor contributing to the segregationist distribution of blacks and whites was purely social. Blacks constituted the great bulk of the laborer force in the South during that period. The relegation of blacks to labor was a passive adaptation of racially discriminatory social practices to the seniority system and not *vice versa*. Like the gentlemen's agreement, that practice had no bearing upon the theoretical or structural components of the seniority system. The presence of divisive social prejudice does not, alone, constitute a proper predicate upon which to impose restorative legal remedies which will operate at the

expense of innocent people. *See Wygant v. Jackson Board of Education,* —— U.S. ——, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986) ("[A]s the basis for imposing discriminatory *legal* remedies that work against innocent people, societal discrimination is insufficient and over expansive") (emphasis in original).

Society's past racial misconceptions and the gentlemen's agreement jointly operated to consign blacks to inferior positions at Gulf. However, neither of these wrongs are connected in anyway with the seniority system.

Gulf's seniority system met other criteria of legitimacy. In both Labor and Craft, promotions, demotions, and layoffs were objectively determined by seniority. The seniority system was typical of that used in the industry at plants predominately black and those predominately white. There is no evidence that the OCAW International's bargaining policies were racially biased, or that the OCAW negotiated along racial lines.

The Court cannot infer that Gulf's seniority system was motivated by discriminatory prejudices or maintained as a construct by which to perpetuate racial imbalances. Hence, under *James* factor number three, Gulf's seniority system did not have its genesis in racial discrimination.

### (iv) *Illegality of the Seniority System*

There is no evidence that Gulf or the OCAW engaged in any illegal activity with respect to the formulation or maintenance of the seniority system.

Employing the *James* test, the Court finds that Gulf's seniority system was bona fide. The plant-wide seniority system was instituted prior to the enactment of Title VII; along with job posting and job bidding. *See James,* 559 F.2d at 352–53. The major negative impact from the use of divisional seniority occurred during the 1959–1961 workforce reductions, well before the effective date of Title VII. Whites were also victims of the demotions and loss of rank.

Gulf and the OCAW had substantially eradicated the imperfections associated with the pre-Title VII system in other ways. For example, Gulf established night school programs in 1965 and 1966 to assist those in the lower job classifications to advance. Gulf paid the employee's tuition and expenses, as well as $2.50 per hour to attend. A number of other affirmative action programs were also established. For these reasons, the Court finds that there were no lingering discriminatory effects subsequent to the December 26, 1966 cut-off date.

### (2) *Post-Title VII Discrimination: Stipulation 29*

█ In 1967, Gulf and the OCAW negotiated Stipulation 29. Stipulation 29 simplified the complex craft promotion lines. Under Stipulation 29, mechanical trainee became the entry-level position for all crafts. Labor Division employees could bid directly into the craft-trainee position without first bidding into the Mechanical Helper Pool. Craft Division incumbents whose jobs were being eliminated because of the simplification program were administered a simple reading and writing test (out of 204 persons taking the test, one failed). Upon passing the test, the displaced employees were reclassified as mechanical trainees. Stipulation 29 applied equally to blacks and whites.

Plaintiffs argue that Stipulation 29 constituted a separate violation of Title VII and § 1981. Although blacks and whites were facially treated equally under the stipulation, Plaintiffs state that the overwhelming majority of employees who benefitted were white. Plaintiffs point again to blacks who earlier had returned to labor due to the workforce reductions as the prime example of those who did not benefit under the stipulation. Most of the blacks excluded from benefitting under the stipulation had more plant seniority, say Plaintiffs, than the craft-line whites who took the simple test and were reclassified as mechanical trainees. Plaintiffs argue that by favoring whites not demoted to labor under the 1956–1963 divisional seniority

scheme, Stipulation 29 effectively diluted their seniority rights by making it more difficult for them to bypass whites who, with less plant seniority, but more Craft Division seniority, now occupied higher Craft Division positions.

Plaintiffs admit that the Stipulation 29 test did not have an adverse impact on them. Indeed, of the 204 senior employees who took the Stipulation 29 test, only one failed. Most importantly, those same employees would have reached the mechanical trainee program first under the old bona fide system.

Moreover, under a 1971 conciliation agreement between Gulf and the Government, blacks who had been demoted to the Labor Division during the workforce reductions, and were thus absent from the Craft Division when Stipulation 29 was implemented, were offered promotions to the number one positions in their prior crafts at competitive rates of pay. For these reasons, Stipulation 29 does not constitute a separate Title VII or § 1981 violation.

B. *The Craft Training Tests*

A successful bidder had to pass examinations before transferring into a craft-line position. The same tests were administered for each craft line. The "Old Tests" were used to screen bidders between 1947 and 1971; and the "New Tests" were used to screen bidders after 1971.[3] No cut-off scores were used in scoring the new tests. However, those achieving high scores were selected, *pari passu*, over those achieving extremely low scores.

Plaintiffs' statistics show that 82.5% of whites who took the Old Tests between January 1969 and March 1971 ultimately passed. Only 42.8% of blacks who took the

same tests during that period ultimately passed. Between 1971 and 1980, 97.7% of the whites who took the New Tests passed them, while only 66% of the blacks who took those tests passed.

Under the "80% rule," Plaintiffs' statistics demonstrate adverse impact under both sets of tests because the proportion of blacks passing the tests is less than 80% of the proportion of whites passing the tests. *See* 29 C.F.R. 1607.4(D) (1981). Therefore, Defendant must show that the employment tests are job-related.

### Are The Tests Job-Related?

In *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), the Supreme Court held that Title VII forbids the use of tests or other employment selection criteria that have the effect of excluding blacks at substantially higher rates than whites, absent a showing that the test or employment selection criteria are job related. If, as in this case, a test is shown to have a discriminatory impact, the employer must, by professionally accepted methods, prove that the test is "predictive of or significantly correlated with important elements of work behavior that comprise or are relevant to the job or jobs for which candidates are being evaluated." *Contreras v. City of Los Angeles,* 656 F.2d 1267, 1280 (9th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982).

A criteria validation study, which has been described by the Fifth Circuit as the "most accurate way to validate an employment test," *United States v. Georgia Power Co.,* 474 F.2d 906, 912 (5th Cir.1973), was conducted by Gulf on the New Tests in 1983.[4] Plaintiffs' only real objection to

---

**3.** The Old Tests consisted of six separate tests: (A) Test of Reading Comprehension; (B) Test of Arithmetic Fundamentals; (C) Wonderlic Personnel Test; (D) Mechanical Aptitudes Test; (E) Mechanical Insight Test; (F) A Lee-Clark Arithmetic Test. (These tests were apparently administered in addition to the 1956–1963 battery of tests). See footnote 2, *supra.*

The New Tests consisted of four parts: (A) Bennett Mechanical Comprehension Test; (B) Test

of Chemical Comprehension; (C) Arithmetic Test; (D) Test Learning Ability. After 1971, these tests were also used for the hiring of new employees. Thus, any employee hired after 1971 was not required to take any additional tests to enter a craft.

**4.** "Criterion-related" validity is established by showing that a test measures abilities which are component parts of jobs, mastery of which cor-

that study is predicated upon the "performance elements" used by Gulf.[5] These elements, say Plaintiffs, were for the most part general (or cognitive) ability elements completely unrelated to the actual duties employees had to perform. Plaintiffs argue that the validity study should have been predicated upon a list of actual duty elements.[6]

The Court finds that the criteria employed by Gulf to validate its New Tests reliably correlate with important elements that comprise or are relevant to the craft jobs. Plaintiffs' proposal that Gulf's tests be validated exclusively in accordance with performance dimensions that bear a one-to-one, rectilinear correlation with the actual duties of the entry-level positions would require the use of tests that possess little if any predictive value.[7]

If these tests were being used to screen for the entry-level positions only, Plaintiffs' actual duty elements might be acceptable criteria. The entry-level positions at Gulf, however, are only the first steps in a highly formalized promotion scheme. Because promotions are based entirely upon seniori-ty, advancement in a progression line is virtually assured. To be able to perform well in the advanced craft positions, the worker must be able to learn, or generalize, from his experience in the lower craft positions, and systematically apply those principles to the responsibilities of the higher jobs. That learning process requires certain cognitive abilities which are not situationally specific. Such innate abilities are not readily discoverable through the use of tests that measure only the abilities to perform the actual duties of the lowest craft job.

Since Gulf does not test for competency prior to promoting to a higher craft position, it is imperative that the company be reasonably certain at the time an employee enters the Craft Division that that employee is able, for reasons of safety and efficiency, to learn new skills and acquire new knowledge. *See Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1168 (5th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976).

Also, most of Plaintiffs' actual duty elements involved abilities Plaintiffs should

relates with some measure of subsequent successful job performance.

So far as the Old Tests are concerned, Gulf was not required to validate them, for the reason that the Old Tests were eliminated four years before *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), imposed validation requirements; and seven years before The Equal Employment Opportunity Guidelines in Employee Selection Procedures instigated validated studies.

5. The performance elements are: (1) learning new procedures quickly; (2) knowing when to get help; (3) handling several tasks at once; (4) understanding written instructions; (5) understanding oral instructions; (6) working without supervision; (7) paying attention to detail; (8) passing on instructions to others; (9) training other employees; (10) taking a systematic approach to work; (11) planning own work; (12) following standard operating procedures; (13) identifying problem situations quickly; (14) making accurate entries in logs or records; (15) completing assignments on time; (16) reading prints and diagrams; (17) setting priorities; (18) devising creative solutions; (19) remembering large amounts of detail; (20) making on-the-spot decisions; (21) communicating orally; (22) working with others.

6. For example, the actual duty elements for a boilermaker, according to Plaintiffs, are: (1) using common hand-held tools; (2) following safety procedures; (3) working at heights over 4 feet; (5) working as a member of a team; (6) carrying out simple oral instructions; (7) working outside; (8) using handling and lifting devices; (9) repairing frames and platforms; (10) maintaining clean work area. The actual duty elements for the other craft positions are virtually the same as these and do not require separate mention.

7. There is some overlap in the criterion measures used by both parties (e.g., both suggest tests which measure one's ability to follow safety procedures; and understand oral instructions). To that extent, no controversy exists. Some of Defendants' criteria, though not identical to Plaintiffs', are actual duty elements of the same species (e.g., the ability to make accurate entries in logs; and communicating orally). All in all, about one-half of Defendants' criteria are actual duty elements of the same character as Plaintiffs'. The other half constitute the cognitive ability elements and are the ones spawning the real controversy.

have already learned in the Labor Division. For example, each aspiring craftsman had already acquired the basic "hands-on" skills in the use of tools and materials. Testing only for such basic actual duty skills could not predict which workers had potential for promotion up through the ranks. Quite simply, Gulf's overriding interest lay in ascertaining which of the equally experienced laborers had the greatest potential to train for new assignments. That approach, the use of employment tests to measure trainability irrespective of the test's possible relationship to actual performance on the job, was approved by the Supreme Court in *Washington v. Davis*, 426 U.S. 229, 250, 96 S.Ct. 2040, 2052, 48 L.Ed.2d 597 (1976).

The Court does not find the fact that Gulf used the same employment tests for all the craft-line destructive of the tests' validity. The tests were given to insure that an employee had the rudimentary skills necessary to be put into a training program. *See Ensley Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812, 822 (5th Cir. 1980), (tests used to screen out candidates not possessing minimum skills as opposed to ranking applicants according to scores are justified). Although the mechanics of each job vary, the conceptual and intellectual competence required to perform each job is not significantly different. The carpenter, the pipefitter, the mechanic, and the other craftsmen all need the ability to conceptualize three-dimensional objects on the basis of two-dimensional drawings. Each must create physical objects in accordance with written or graphic specifications. All craftsmen must understand the geometrical relationships between the things they work with and be able to think in terms of area, volume, and length. Trainability based upon these and similar facets of each craft job being the transcendent criterion of eligibility, no unfairness results from the inter-craft use of these tests.

The Court, therefore, holds that the New Tests are job-related and immune to attack under Title VII.

C. *Discriminatory Application of S & A Policy*

■ Plaintiffs contend that Gulf discriminatorily applied its sickness and accident ("S & A") policy to blacks. The critical period is 1975 to 1980.

The policy at Gulf was that 80 or more S & A hours per year triggered an inspection of a senior bidder's record. If, in the opinion of the company, his record was unsatisfactory, he would be bypassed for the job.

Plaintiffs argue that during the years 1975–1980, 33.1% of all black bidders and 22.0% of all white bidders were rejected because of their unsatisfactory S & A records.

Gulf's S & A policy was applied equally to blacks and whites. Hence, even if Gulf's S & A policy resulted in adverse impact on blacks, its use is justified as good business practice under Title VII. *See Gilchrist v. Bolger*, 733 F.2d 1551, 1553 (11th Cir.1984).

D. *Discriminatory Selection of Supervisors*

■ Gulf promoted employees to supervisory positions on both a temporary and permanent basis. Plaintiffs argue that between 1967 and 1982, blacks were selected as supervisors at rates inconsistent with their representation in the relevant eligibility pool; which, according to Plaintiffs, is the total number of hourly employees. Plaintiffs further contend that between 1965 and 1982, there were a total of 209 promotions to supervisor, with 22 or 10.5% going to blacks.

Gulf generally promoted upper level employees in the Craft Division to supervisor. Therefore, Gulf argued, the relevant eligibility pool was not the set of hourly employees, but rather those in the top jobs. During the period in issue, blacks constituted 11.35% of the top-job employees; 13.7% of the supervisory promotions went to blacks. In order to afford supervisory opportunities to blacks, Gulf argues, it promoted blacks with less seniority faster than it did whites. Blacks were promoted to

supervisor after they had averaged approximately 19 years at the plant and approximately 3 years in the No. 1 job. Whites had to wait longer—approximately 26 years at the plant and approximately 8½ years in the No. 1 job.

The Court finds that Gulf's policy of promoting top-level employees to supervisor is justified. Not surprisingly or unreasonably, Gulf wanted to promote to supervisor only those employees who had substantial experience in the crafts they were to oversee. That is a universal business practice based upon the fact that such experienced supervisors are best qualified to promote efficiency and safety. *See Watkins*, 530 F.2d at 1168.

Moreover, although Gulf's standards of selection were unwritten and subjective, the Court finds no evidence that the standards were discriminatorily applied. *See Pouncy v. Prudential Ins. Co. of America*, 668 F.2d 795, 800–801 (5th Cir.1982) (absent proof of discriminatory intent, the use of subjective decision-making procedures is not *per se* discriminatory). The evidence presented does not demonstrate that Gulf intended to discriminate, or, from a statistical standpoint, that it did discriminate in promoting craftsmen to supervisory jobs.

### E. *Union Liability*

▮▮▮ A union breaches its duty of fair representation "only when [the] Union's conduct toward a member of a collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). The OCAW had responsibility for negotiating the plant seniority system and Stipulation 29. The Court has found that the seniority system was bona fide and that Stipulation 29 did not retard blacks' advancement into the craftlines. On those facts, the Court concludes that the Union did not breach its duty of fair representation to the Plaintiffs, as to either the seniority system or Stipulation 29.[8]

Nor was there any credible evidence introduced that the Union did not properly pursue black members' grievances, as Plaintiffs allege. Indeed, Mr. Stelly, a former union representative and witness for Plaintiffs, testified that while he was Chairman of the Workman's Committee, everyone who asked for help received it. The Court therefore finds no fault with the Union.

## II. INDIVIDUAL CLAIMS

The Court having found for Gulf and the OCAW on the classwide claims, Plaintiffs' individual claims based upon the same allegations are precluded. *Cooper v. Federal Reserve Bank*, 467 U.S. 867, 104 S.Ct. 2794, 2802, 81 L.Ed.2d 718 (1984). However, the named Plaintiffs may pursue their individual claims of intentional racial discrimination. *Id.*

In a Title VII cause of action for employment discrimination, the Plaintiff has the initial burden of establishing a prima facie case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). In *McDonnell-Douglas*, the Court propounded a four-pronged test which, though schematized for application in discriminatory hiring cases, has been extended by this circuit, for example, to discriminatory termination cases. *Burdine v. Texas Department of Community Affairs*, 608 F.2d 563 (5th Cir.1979), *vacated and remanded*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Since discriminatory failure to promote is analogous to discriminatory termination, the *Burdine* test applies here.

---

**8.** In *Sinyard v. Foote & Davies*, 577 F.2d 943, 945–46 (5th Cir.1978), the court held that Title VII does not impose an affirmative policing duty upon the international union for a discriminatory contract negotiated by one of its locals without the international's assistance or sanction. In our case, the gentlemen's agreement between the locals to not compete did not involve Gulf or the OCAW International. Indeed, the agreement was not so much an accord between the locals acting in their official capacities but rather a job-protecting accomodation reached among the rank and file themselves.

The Plaintiff must prove that (1) he belongs to a group protected by Title VII, (2) he was qualified for the job, (3) he was not promoted, and (4) the employer promoted one not in Plaintiff's protected class. If Plaintiff makes out a prima facie case, the employer must produce "evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the employer meets this burden, "the presumption of discrimination 'drops from the case,' and the District Court is in a position to decide ... whether the particular employment decision at issue was made on the basis of race." *Cooper v. Federal Reserve Bank,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). As will be seen, none of the Plaintiffs' individual claims rise to the level of a prima facie case of employment discrimination under *McDonnell Douglas.*

■ *Elton Hayes:* Mr. Hayes alleges that Gulf discriminatorily failed to promote him to a supervisory position. Although there is evidence that Mr. Hayes was qualified for the position, he did not apply for it. This, despite the fact that Mr. Hayes admitted that he knew of about 17 blacks who had been promoted to supervisor. Hence, Mr. Hayes could not reasonably argue that it would have been a futile gesture for him to make a request to become a supervisor. E.g., *International Brotherhood of Teamsters v. U.S.,* 431 U.S. at 367, 97 S.Ct. at 1870. Because Mr. Hayes failed to make a request for a promotion, he has failed to make out a prima facie case of employment discrimination. Therefore, no inference of intentional discrimination has been raised.

*Wesley Bernard:* Mr. Bernard alleges that promotions due him were delayed because of test failures, that he was disqualified from jobs for which he was fit, and that he was discriminatorily denied a promotion to a supervisory position. Since the craft tests do not constitute a *Griggs* violation, Mr. Bernard's test claims are foreclos-

ed by the classwide judgment; his other claims also are without merit.

■ With respect to his disqualification claim, Mr. Bernard has not proven that he was qualified for those positions. He offered no evidence that a white employee got the position he desired, or about how many blacks requested such a position and had their requests denied or granted. Intentional discrimination cannot be inferred from these facts.

■ Mr. Bernard requested supervisory promotions twice. The first time was in the early 1960's (by his recollection) and is outside the time frame of this litigation. The second time was in the 1970's (as he recalls) and Mr. Bernard was denied the job in favor of a Mr. Butaud, a white employee. However, Mr. Butaud was in the top craft position at the time; Mr. Bernard was not. In fact, Mr. Bernard conceded at trial that at the time he made the request he was not qualified for the promotion. Therefore, Gulf had good reason to promote Mr. Butaud over Mr. Bernard. Gulf's selection of Mr. Butaud evidences no discriminatory intent against Mr. Bernard. Mr. Bernard has failed to establish a prima facie case of employment discrimination.

■ *Hence Brown:* Mr. Brown testified that he wanted to be a supervisor but that he had not told anyone of his desire because he thought that would have been useless. However, Mr. Brown admitted that he knew of one black supervisor in his department. Moreover, statistics showed that many blacks were promoted to supervisory positions. Mr. Brown should have filed for a promotion. Other blacks at Gulf did request and receive supervisory promotions. Because Mr. Brown did not request a promotion, he was passed over. No inference of intentional discrimination can be drawn when Plaintiff did not even make a request for promotion.

Therefore, Mr. Brown has not set forth a prima facie case of employment discrimination.

■ *Rodney Tizeno:* Mr. Tizeno's claims are that the seniority system at Gulf

discriminatorily thwarted his upward mobility, that he was one of the blacks excluded from benefitting under Stipulation 29, and that he was discriminatorily denied promotions to supervisory positions. The classwide judgment forecloses Mr. Tizeno's claims founded upon the mala fides of the seniority system. Although it is true that Mr. Tizeno was one of the blacks who was absent when Stipulation 29 went into effect, he was offered the opportunity, pursuant to the 1971 agreement between Gulf and the government, to enter a two-year training program that would have positioned Mr. Tizeno at or near where Stipulation 29 would have positioned him. Mr. Tizeno refused the offer. Mr. Tizeno offers only *ad hominem* statements as to why he was qualified for a supervisory job and why he was denied that job. Although he testifies that Mr. Chesser, a white employee, received a promotion he requested, Mr. Tizeno offers no evidence that he was better qualified for that position.

Again, the Court cannot conclude from such snap-shot testimony that Mr. Tizeno was not promoted because of an intent to discriminate against him by Gulf. Mr. Tizeno has failed to make out a prima facie case of employment discrimination.

*Willie Johnson:* Mr. Johnson's allegations center upon the negative effects the seniority system and testing requirements had upon him. Those claims are barred by the classwide judgment.

Mr. Johnson also complains of an allegedly discriminatory incident in which he was subjected to a racial slur that was condoned by Gulf and that lead to his self-disqualification from a craft-line position. Even if true, this allegation is barred because the act complained of was not committed within the time period covered by this lawsuit. See *Evans,* 431 U.S. at 558, 97 S.Ct. at 1889.

This decision culminates a long and complex employment discrimination case. The Court has pondered the evidence and the law and has concluded that the seniority system and the employment tests were non-discriminatory. The Court has also found that none of the business procedures and policies followed by Gulf and the OCAW were motivated by bad intent or fell too harshly upon blacks. For these reasons, the Court holds that the named Plaintiffs have failed to demonstrate that either Gulf or the OCAW violated any duty owed to them, individually or as a class, under Title VII of the Civil Rights Act of 1964 or Section 16 of the Enforcement Act of 1870. Accordingly, Plaintiffs, individually and as a class, take nothing by their action.

## FINAL JUDGMENT

This is a class action employment discrimination suit in which Plaintiffs seek declaratory, injunctive, and monetary relief pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. and Section 16 of the Enforcement Act of 1870, 42 U.S.C. § 1981. The named Plaintiffs are present or retired black employees at Gulf Oil Corporation's ("Gulf") Port Arthur, Texas, Refinery. The Plaintiff class consists of black persons who were employed at Gulf's Port Arthur Refinery on or after December 26, 1966, who were members of the Oil, Chemical and Atomic Workers' International Union, Local Union 4–23 ("OCAW"), and who had not executed releases in connection with a Conciliation Agreement between Gulf and the Equal Employment Opportunity Commission ("EEOC"). The Defendants are Gulf Oil Corporation, predecessor in interest to Chevron U.S.A., a Pennsylvania corporation; the Oil, Chemical and Atomic Workers' International Union; and the Oil, Chemical and Atomic Workers' International Union, Local Union 4–23.

The Court having jurisdiction of the parties and subject matter, the action came on for trial before the Court without a jury. The issues were limited to the individual and class-wide liability of Gulf and the OCAW. Evidence was presented on Plaintiffs' allegations that, *inter alia,*

1. Gulf's seniority system unlawfully discriminated against black employees and was not bona fide;

2. Stipulation 29 to the 1967 Collective Bargaining Agreement between Gulf and the OCAW unlawfully discriminated against black employees;

3. the tests used for promotion to the Mechanical Training Program had an unlawful, discriminatory effect on black employees and were not job-related;

4. the use of sickness and attendance ("S & A") records in making certain promotions resulted in unlawful adverse impact on black employees, and were used to commit intentional discrimination against black employees;

5. blacks were unlawfully and discriminatorily disqualified from certain jobs because of race;

6. promotions to supervisor were made on a racially discriminatory basis;

7. the OCAW breached its duty of fair representation;

8. the named Plaintiffs Wesley P. Bernard, Elton Hayes, Hence Brown, Rodney Tizeno, and Willie Johnson, Sr. were individual victims of intentional racial discrimination by Gulf and the OCAW.

The issues having been presented and arguments of counsel having been heard, the Court finds that Plaintiffs have failed to prove these or any related allegations of employment discrimination. It is, therefore,

ORDERED, ADJUDGED and DECREED that Plaintiffs, individually and as a class, take nothing by their lawsuit; and, further, that this action is DISMISSED with prejudice, and all parties are to bear their own costs and attorneys' fees.